**PUBLIC INTEREST RESEARCH GROUP OF NEW JERSEY, INC., et al., Plaintiffs,**

v.

**Donald B. RICE, as Secretary of the Air Force, Defendant.**

**Civ. No. 90–2138 (CSF).**

United States District Court, D. New Jersey.

Sept. 23, 1991.

Terris, Pravlik & Wagner by Bruce J. Terris, Kathleen L. Millian, Mark V. Dugan and William H. Brack, Washington, D.C., and Edward Lloyd, Newark, N.J., for plaintiffs.

Barry M. Hartman, Asst. Atty. Gen. by Ronald M. Spritzer, Asst. Atty. Gen., Environmental Defense Section, Environment and Natural Resources Div., U.S. Dept. of Justice, Major Richard E. Sarver, Chief, Environmental Litigation Div., Central Environmental Law Office, U.S. Air Force, Washington, D.C., and Michael Chertoff, U.S. Atty. by Irene Dowdy, Asst. U.S. Atty., Trenton, N.J., for defendant.

## OPINION

CLARKSON S. FISHER, District Judge.

Before the court is the motion of the plaintiffs, Public Interest Research Group of New Jersey ("NJPIRG") and Friends of the Earth ("FOE"), for a preliminary injunction, partial summary judgment on the issue of liability and permanent injunctive relief against defendant, Donald B. Rice, the Secretary of the United States Air Force. Defendant has moved for partial summary judgment on the issue of the availability of civil penalties against an agent of the United States Government. The court having considered the written submissions and oral argument of counsel; and counsel, in response to inquiry from the court, having assured the court that all evidence was now before it and they had nothing to add; and for the reasons stated below, the court will grant the plaintiffs' motion for partial summary as to defendant's liability and issue permanent injunctive relief. The defendant's motion for summary judgment as to the civil penalties is stayed pending resolution of a similar issue by the United States Supreme Court.

NJPIRG and FOE are nonprofit corporations that share an interest in the protection and improvement of the quality of water in New Jersey. Seeking to protect the interests of their members in the quality of Crosswicks Creek, the Delaware River, the Delaware Bay and tidally-related waters, plaintiffs have brought this action.

Defendant, Donald B. Rice, is the Secretary of the United States Department of the Air Force, which operates McGuire Air

Force Base ("MAFB") in New Hanover, New Jersey. By statute, the Secretary of the Air Force must conduct all Air Force Department affairs, including the construction, maintenance and repair of buildings, other structures and utilities, and the acquisition of interests in real property necessary to carry out the responsibilities of the Air Force. 10 U.S.C. § 8013(b).

In 1974, the United States Environmental Protection Agency ("the EPA") issued National Pollutant Discharge Elimination System ("NPDES") permit number NJ 0022578 to defendant's facility. The permit authorized certain discharges into the South Run of Crosswicks Creek from that facility through one discharge point, outfall 001. This permit expired on June 30, 1982.

On April 13, 1982, the EPA delegated responsibility to the New Jersey Department of Environmental Protection ("NJDEP") for administering the National Pollutant Discharge Elimination System ("NPDES") program in New Jersey. *See* 33 U.S.C. § 1342(a)–(b).[1] On August 1, 1989, the NJDEP, pursuant to the authority delegated to it by the EPA and to section 58:10A–6 of the New Jersey Water Pollution Control Act, N.J.S.A. 58:10A–1 to :10A–20, issued a new permit under NJPDES to the defendant. This permit took effect on November 1, 1989. Pl. Exh. 2.

Plaintiffs have obtained defendant's DMRs for the time period from October 1989 through February 1991, Pl. Exh. 3, and contend that these do not present a complete picture of defendant's compliance record. Plaintiffs allege that defendant has committed 955 discharge violations, 659 reporting violations and 20 monitoring violations in the 17–month period from October 1989 through February 1991.

EPA and NJDEP evaluations and inspections show that defendant has repeatedly failed to maintain its wastewater treatment facility adequately and has failed to operate the facility in accordance with federal law. *See* Pl. Exhs. 50, 51 and 52. The

EPA stated that it was "amenable to revising the schedule," and that defendant was "over two years behind the current schedule." Defendant wrote to the EPA asking for renegotiation of the construction compliance schedule, expansion of the 1985 FFCA interim limits and the setting of significantly lower limits to defendant's 1989 NJPDES permit. Pl. Exh. 73 pp. 1–2.

On October 26, 1990, defendant and the EPA signed an "Order on Consent." Pl. Exh. 29. The order contained an explicit statement that it "[did] not constitute a waiver from compliance with or modification of the effective terms and conditions of the Respondents' permit, which remain in full force and effect." *Id.* at p. 7. Nevertheless, the order included the weakened effluent limits that defendant had proposed. The order also extended the final construction compliance deadline by nearly three years, from February 1991 until November 30, 1994. *Id.* at 6–7.

On May 30, 1990, after complying with the notice provisions of section 505(b) of the Act, 33 U.S.C. § 1365(b), plaintiffs filed this citizen suit under section 505. Plaintiffs allege that defendant violated and continues to violate sections 301, 308, and 402 of the Act by failing to comply with the discharge limitations and the monitoring and reporting requirements in its NPDES/NJPDES permit No. 0022578. On August 27, 1990, defendant filed its Answer and Affirmative Defenses. Subsequently, defendant, while admitting that it cannot comply with the terms of the 1989 permit, filed a motion for summary judgment on the issue of whether the Air Force is immune from civil penalties. Thereafter, plaintiffs filed a motion for partial summary judgment as to defendant's liability and permanent injunctive relief.

Initially, plaintiffs request an injunction requiring defendant to comply with the Tertiary Wastewater Treatment Facility compliance schedule in the October 26, 1990, "Order on Consent." As defendant has agreed to this, the court has no prob-

---

**1.** The expired 1977 permit remained in effect until the State issued a new permit. N.J.S.A. 52:14B–11.

lem in ordering compliance with the construction schedule contained in the "Order on Consent."

Plaintiffs also seek to require defendant to undertake certain remedial measures, as well as repairs and maintenance, to bring its facility into compliance with its 1989 NPDES permit or any future permit, including but not limited to the installation of two Traveling Bridge Automatic Backwash Filters ("backwash filters"), at defendant's existing wastewater treatment facility. Plaintiffs' expert, Dr. Bruce A. Bell, in his affidavit, stated that because the plan for the Tertiary Wastewater Treatment Facility includes, as part of the final settling tank system design, three of these backwash filters, two of these could be installed and remain in place at the existing facility until it is necessary to remove them and install them at defendant's planned tertiary facility, as required by the April 1990 design analysis. *See* Pl. Exh. 26, ¶ 10. Dr. Bell noted that if installed and operated correctly, these filters would reduce current BOD5 and TSS levels at the existing facility by 50% or more, and that studies have shown TSS reductions of 70% by similar filters. *Id.* ¶¶ 9, 10. He also noted that the installation of the filters would decrease the amount of phosphorus in the effluent from defendant's existing facility. *Id.* ¶ 9. He estimated the cost of the installation of these filters to be $350,000.

The Federal Water Pollution Control Act (the "Act") was enacted by Congress in 1972 "to restore and maintain the chemical, physical and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a). Among other things, "the Act makes unlawful the discharge of any pollutant into navigable waters except as authorized by specified sections of the Act. 33 U.S.C. § 1311(a)." *Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc.*, 484 U.S. 49, 52, 108 S.Ct. 376, 379, 98 L.Ed.2d 306 (1987). For example, pursuant to section 402 of the Act, "the Administrator of the Environmental Protection Agency ("EPA"), or a state which has established its own EPA-approved permit program, may issue a permit allowing effluent discharges in accordance with specified conditions. 33

U.S.C. § 1342(b), (c)." *Natural Resources Defense Council, Inc. v. Texaco Refining & Marketing Inc.*, 906 F.2d 934, 935 (3d Cir.1990).

An entity which holds an EPA-issued NPDES permit "is subject to enforcement action by the Administrator [of the EPA] for failure to comply with the conditions of the permit." *Gwaltney*, 484 U.S. at 52–53, 108 S.Ct. at 378–79. Entities holding state-issued permits are subject to both state and federal enforcement action for failure to comply. *Id.* at 53, 108 S.Ct. at 379. In the absence of state or federal enforcement, private citizens may, upon compliance with certain notice provisions, file suit. *Id.*

Pursuant to section 505 of the Act, private citizens may commence civil actions against any entity "alleged to be in violation of" the conditions of either a federal or state permit. 33 U.S.C. § 1365(a)(1). In this citizen suit, plaintiffs allege that the defendant has repeatedly discharged pollutants from its terminal into Crosswicks Creek, the Delaware River and Delaware Bay in violation of the terms of its effluent limitations permit. Plaintiffs now seek partial summary judgment as to defendant's liability for the discharges and permanent injunctive relief.

In opposition to plaintiffs' motion, Rice asserts that plaintiffs lack standing to bring this action, that the EPA consent order sets forth the appropriate remedy in this case, and that the equitable relief they seek is not justified or consistent with the objectives of the Clean Water Act. Additionally, defendant has cross-moved for summary judgment, or alternatively, a stay as to availability of civil penalties.

The court will withhold judgment on defendant's motion for summary judgment. The issue for this court to decide in that motion is whether sections 313 and 505 of the Clean Water Act, 33 U.S.C. § 1323, waive the sovereign immunity of the United States, thereby, permitting the court to award civil penalties for violations of the Act by a federal agency. The Air Force argues that as an agent of the federal government it is cloaked in sovereign im-

munity and cannot be held liable for the civil penalties generally available under the statute. That issue is presently before the United States Supreme Court in *Ohio v. U.S. Department of Energy,* 904 F.2d 1058 (6th Cir.1990), *cert. granted,* — U.S. —, 111 S.Ct. 2256, 114 L.Ed.2d 709 (1991) (to be argued during the Fall Term 1991). Therefore, this court will reserve decision on the issue until such time as the Supreme Court has considered and decided the case.

## A. *Standing*

■ Defendant asserts that plaintiffs are without standing to bring this suit. Under Article III of the Constitution, federal courts may resolve only actual cases or controversies. U.S. Const. art. III, § 2. If a party "has a sufficient stake in an otherwise justiciable controversy to obtain judicial resolution of that controversy, ..." it has standing to sue. *Sierra Club v. Morton,* 405 U.S. 727, 731–32, 92 S.Ct. 1361, 1364–65, 31 L.Ed.2d 636 (1972). This requirement of a "personal stake" in the outcome of the controversy aids the court by assuring the "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions." *Larson v. Valente,* 456 U.S. 228, 238–39, 102 S.Ct. 1673, 1680–81, 72 L.Ed.2d 33 (1982).

In *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982), the Court articulated a test for determining whether a party has the requisite "personal stake" in the outcome:

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," ... and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision" ...

*Id.* (citations omitted).

In *Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97

S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977), the Supreme Court held that an association has standing to sue on behalf of its members "when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of the individual members in the lawsuit." *See also New York State Club Ass'n v. New York,* 487 U.S. 1, 9, 108 S.Ct. 2225, 2232, 101 L.Ed.2d 1 (1988); *Sierra Club,* 405 U.S. at 739, 92 S.Ct. at 1368 (organization whose members are sufficiently affected may sue on their behalf).

The first question this court must resolve is whether, under the test set forth in *Valley Forge,* the members of plaintiffs' organizations have a sufficient connection to this dispute such that they would have standing to sue in their own right. *See Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn Terminals Inc.,* 913 F.2d 64, 70–71 (3d Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 1018, 112 L.Ed.2d 1100 (1991). Defendant argues that plaintiffs have not alleged an injury sufficient to confer standing nor an injury that is fairly traceable to Rice's conduct.

### 1. Injury-in-Fact

Under the Act, "any citizen may commence a civil action." 33 U.S.C. § 1365(a). A "citizen" is "a person or persons having an interest which is or may be adversely affected." *Id.* at § 1365(g).

The Court has determined that cognizable injury can implicate environmental, aesthetic or recreational as well as economic interests. *Sierra Club,* 405 U.S. at 734, 92 S.Ct. at 1366. But injury-in-fact requires more than an injury to a cognizable interest; plaintiffs' members may not simply assert a generalized interest in the conservation of natural resources. *Id.* at 734–35, 92 S.Ct. at 1365–66; *Lujan v. National Wildlife Fed'n,* — U.S. —, 110 S.Ct. 3177, 3189, 111 L.Ed.2d 695 (1990). In order to be considered among the injured, plaintiffs' members must show a connection with the geographical area that is the

subject of the suit. *Sierra Club,* 405 U.S. at 734–35, 92 S.Ct. at 1365–66; *Lujan,* 110 S.Ct. at 3189.

The complaint must properly allege that the members of the plaintiff organizations reside in the vicinity of, own property near, or recreate in or near the body of water into which the defendant discharges pollutants, and that the health, economic, recreational, aesthetic or environmental interests of these members are being and will be adversely affected by the discharges. *See Powell Duffryn,* 913 F.2d at 71; *Natural Resources Defense Council, Inc. v. Outboard Marine Corp.,* 692 F.Supp. 801, 807 (N.D.Ill.1988); *Student Pub. Interest Research Group v. Monsanto Co.,* 600 F.Supp. 1479, 1484 (D.N.J.1985).

In their complaint, plaintiffs allege that their members reside or work near the Delaware River, Crosswicks Creek or tidally-related waters. Complaint ¶ 8. The complaint further alleges that the quality of these waters is adversely affected by defendant's discharges in violation of the terms and conditions of its permit and that defendant's excessive discharges directly affect the health, economic, recreational, aesthetic and environmental interests and well-being of plaintiffs' members. *Id.* ¶¶ 8, 11. In support of these allegations, the plaintiffs have submitted the affidavits of six individuals, one of whom is a member of NJPIRG and five of whom are members of FOE.

These individuals attest that they walk, hike and sail on or near the waters or other waters which are downstream from defendant's facility or tidally related to the area where defendant discharges. Pl. Exhs. 11–16. The affiants claim injury to their aesthetic and recreational interests because of the pollution of these waters. All of the affiants complain of the foul smell or appearance of the waterways, and all of the affiants would not knowingly eat fish from these waterways because of their concern that doing so may be hazardous to their health.

For instance, in his affidavit, Edward Komczyk describes how the pollution in these waters affects his interests. Mr. Komczyk is a member of FOE and lives in Mantua Creek, New Jersey, which receives tidewater from the Delaware River. Pl. Exh. 11, Affidavit of Edward Komczyk ¶¶ 2, 8. He further claims that the pollution in these waters lowers the value of his home. He frequently canoes, boats, fishes, hikes and bird-watches on the Delaware river between Raccoon Creek and Big Timber Creek, in an area downstream from defendant's discharge. *Id.* ¶ 4. Mr. Komczyk also does not recreate directly in or near that area, because it contains pollution and is foul in smell and appearance. *Id.* ¶ 5. In addition, he has required medical attention because of irritation to his eyes while swimming in the relevant area of the river. *Id.* Accordingly, he will no longer swim in this area, because of his concern about contact with harmful pollutants. *Id.* Finally, because Mr. Komczyk does not know how much pollution is in these waterways, he will not knowingly eat fish caught from these waters. *Id.* ¶ 9.

The court concludes that the pollution in Crosswicks Creek, the Delaware River and tidally-related waters has interfered with the enjoyment of this natural resource by the members of NJPIRG and FOE. The harm to the aesthetic, recreational and environmental interests of these affiants is an injury sufficient to satisfy the requirements of Article III. *Sierra Club,* 405 U.S. at 734–35, 92 S.Ct. at 1365–66; *Powell Duffryn,* 913 F.2d at 71. Therefore, the plaintiffs' members have satisfied the first part of the *Valley Forge* test.

### 2. "Fairly Traceable"

Defendant contends that plaintiffs cannot meet the second requirement of the *Valley Forge* test because they cannot demonstrate that the injuries suffered by their members are fairly traceable to defendant's alleged violations of its permit. But plaintiffs' members need not show to a scientific certainty that defendant's effluent alone caused the precise harm they have suffered; in order to satisfy the "fairly traceable" requirement, plaintiffs' members need only show that there is a substantial likelihood that defendant's conduct

caused their harm. *Powell Duffryn,* 913 F.2d at 72 (citing *Duke Power Co. v. Carolina Environmental Study Group, Inc.,* 438 U.S. 59, 75 n. 20, 98 S.Ct. 2620, 2631 n. 20, 57 L.Ed.2d 595 (1978)).

The Court of Appeals for the Third Circuit has determined that this likelihood may be established by showing that a defendant has 1) discharged some pollutant in concentrations greater than allowed by its permit 2) into a waterway in which the plaintiffs have an interest that is or may be adversely affected by the pollutant and that 3) this pollutant causes or contributes to the kinds of injuries alleged by the plaintiffs. *Id.*

In this case, at least four affiants have described the appearance of the Delaware River downstream from Crosswicks Creek as "brownish" and "stale" or "cloudy." *See* Pl. Exh. 12, Affidavit of Lester LaCorte ¶ 4; *Id.* Exh. 13, Affidavit of Richard Kraenter ¶ 4; *Id.* Exh. 14 and 15, Affidavit of Robin and Michael Hoy ¶ 3. The EPA has found that the total suspended solids ("TSS") or turbidity decreases visibility of the water. BISPR exhibit 22, EPA, *Quality Criteria for Water* at 405 (1976) [hereinafter EPA Report I]. The permit contained limits on the TSS or turbidity that defendant could discharge. Defendant's reports to the NJDEP indicate that it discharged in excess of those limitations. Pl. Exh. 21.

One of the affiants, Edward Komczyk, stated that he required medical attention because of irritation to his eyes while swimming in the waters of the Delaware downstream from defendant's discharge. Pl. Exh. 11 and 15. The EPA has found that "[e]xcessive alkalinity can cause problems for swimmers by altering the pH of the lacrimal fluid around the eye, causing irritation." EPA Report I at 12. Defendant's reports to the NJDEP indicate 17 violations of this alkalinity limit contained in the permit.

Three affiants also allege that the odor of the waters is unpleasant. Pl. Exh. 11, ¶ 5; *Id.* Exh. 12, ¶ 4; *Id.* Exhs. 13 and 14. The EPA has found that ammonia contributes to the chemical odor of water. EPA Report I at 210. The permit contained limits on the ammonia and toxic pollutants defendant could discharge. Defendant's reports to the NJDEP indicate that it discharged in excess of those limitations.

All of the affiants state their concern about the unhealthful effects of pollution on humans who might recreate in the Delaware River downstream from defendant's discharge. *See, e.g.,* Pl. Exh. 11, ¶ 9; *Id.* Exh. 12, ¶ 7; Exh. 14, ¶ 7. The EPA has found that ammonia and TSS pose risks to human health. EPA Report I at 210–21, 405. As noted above, defendant has discharged these pollutants in excess of the limitations contained in its permit.

Finally, all of the affiants state that they would not eat fish caught in the River because of their concern for the effect of pollution on the fish. *See, e.g.,* Pl. Exh. 11, ¶ 9; *Id.* Exh. 12, ¶ 7. The EPA has found that ammonia, TDS and phosphorus harm aquatic life. Pl. Exh. 23, EPA, *Quality Criteria for Water* at 1–3 (1986) ("EPA Report II"). Defendant has discharged effluent containing levels of these chemicals that were in excess of permit limits. Pl. Exh. 6.

Defendant maintains that, because plaintiffs are downstream from the point at which Crosswicks Creek flows into the Delaware River, most of plaintiffs' injuries (aside from affiant Krauter's "one visit to the area") cannot be traced fairly to defendant's effluent discharges into Crosswicks Creek. On the contrary, member plaintiffs of an organization downstream from a defendant's discharge need show only that they suffered injuries through waters directly affected by any illegal discharges. This is so even if the members did not use the body of water into which the pollution was initially discharged. *Public Interest Research Group v. Yates Industries, Inc.,* 757 F.Supp. 438, 433 (D.N.J.1991) (standing found where plaintiffs lived downstream of a corporation's discharge into an "unnamed tributary" to the Mile Hollow Brook, which empties into Crosswicks Creek). Plaintiffs in the *Yates* case filed affidavits similar to those here, because of their proximity to Crosswicks Creek and the Delaware River downstream from defendant's discharge.

For all of these reasons, this court concludes that plaintiffs' members have established a substantial likelihood that defendant's discharge of these pollutants in excess of permit restrictions caused their harm. Consequently, plaintiffs' members have met the "fairly traceable" requirement under *Valley Forge.*

### 3. Redressability

In order to meet the final part of the *Valley Forge* test, plaintiffs must demonstrate that their injuries are "likely to be redressed by a favorable decision." This requirement focuses on the connection between the injury suffered by plaintiffs' members and the judicial relief sought. An injunction will redress the injuries of which plaintiffs' members complain. If defendant complies with the injunction, the harm to water quality will be redressed, because the pollution in the Delaware River will decrease. *Powell Duffryn,* 913 F.2d at 73.

Therefore, the members of the plaintiff organizations have successfully established that they have suffered injury, that their injury is fairly traceable to the defendant's conduct and that the judicial relief sought will redress their injury, as required under *Valley Forge.*

In order to have standing to sue on behalf of their members under *Hunt,* plaintiffs must also demonstrate that the interests sought to be protected are germane to their purpose and that individual participation by their members is not necessary to maintain this action. 432 U.S. at 343, 97 S.Ct. at 2441. In their complaint, plaintiffs note that their organizations are dedicated to protecting the environmental, aesthetic or recreational interests of their members in the quality of the waters of New Jersey. Moreover, the nature of the claims and of the relief sought does not make the individual participation of each injured member of those associations indispensable to the proper resolution of this case.

For all of these reasons, the court concludes that plaintiffs have standing to sue on behalf of their members.

### B. *Summary Judgment on Liability*

Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56; *Brown v. Hilton,* 492 F.Supp. 771, 774 (D.N.J.1980). The burden of showing that no genuine issue of material fact exists rests initially on the moving party. *Goodman v. Mead Johnson & Co.,* 534 F.2d 566, 573 (3d Cir.1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). "This burden ... may be discharged by 'showing' ... that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

There is no genuine issue for trial unless the nonmoving party can demonstrate that there is sufficient evidence favoring the nonmoving party so that a reasonable jury could return a verdict in that party's favor. *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. In deciding a motion for summary judgment, the court must construe the facts in the light most favorable to the nonmoving party. *Pollock v. American Tel. & Tel. Long Lines,* 794 F.2d 860, 864 (3d Cir.1986). The role of the court, however, is not "to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2511.

Defendant has admitted in official reports that its discharges have exceeded the effluent limitations in its permits. The use of reports or records, required under the law, have long been used as admissions in establishing civil liability. *See e.g., Garner v. United States,* 424 U.S. 648, 96 S.Ct. 1178, 47 L.Ed.2d 370 (1976). In fact, the United States Supreme Court has followed this rule in connection with the Act. *Unit-*

*ed States v. Ward,* 448 U.S. 242, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980) (Court used defendants' report of an oil spill into navigable waters, as required by section 311(b)(5), 33 U.S.C. § 1321(b)(5), to establish defendant's liability for civil penalties under 33 U.S.C. § 1321(b)(6)). Defendant has admitted in its DMRs, laboratory reports and supplemental operating logs that it violated the terms and conditions of its permit. Pl. Exh. 6.

A violation of a permit limitation by a discharger is an automatic violation of the Act. *See Student Pub. Interest Research Group v. P.D. Oil & Chemical Storage, Inc.,* 627 F.Supp. 1074, 1087 (D.N.J.1986); *Student Pub. Interest Research Group of New Jersey, Inc. v. AT & T Bell Labs.,* 617 F.Supp. 1190, 1203 (D.N.J.1985). Any citizen may commence a civil action on his own behalf against any person, including the United States, who is in violation of an effluent standard or limitation or order issued by the Administrator or a state with respect to such a standard or limitation. 33 U.S.C. § 1365(a). Accordingly, PIRG and FOE have demonstrated that the defendant has not complied with the terms of the 1989 permit.

■ Defendant does not dispute that it is in violation of the terms of the permit. Rather, defendant argues that the existing Secondary Treatment Plant (MAFB) is incapable of compliance. Plaintiffs' own expert has acknowledged that it was not realistic to expect the plant to meet the requirements of the 1989 permit when it was issued. Accordingly, the only solution was the construction of a new plant. Bell deposition, Defendant's brief, exh. 6, pp. 84–86. MAFB is allegedly pursuing this remedy.

In October of 1990, the Air Force signed an administrative Order on Consent issued by the EPA which provided for a construction schedule for the Tertiary Waste Treatment Facility ("TWTF") and interim effluent limits to be met while the new plant is under construction. Defendant argues that the interim effluent limitations in the consent order are acts of enforcement discretion under the Act which EPA may use when a facility has a NPDES permit with effluent limitations it cannot meet, but is building a new facility in order to comply with the Act. By this order, the EPA consents to accept the interim limits and agrees not to take additional enforcement action against the facility as to the NPDES effluent limitations while the interim limits are in effect and the facility is in compliance with those limits. Defendant's brief at 11.

Defendant urges the court, in balancing the equities, to be very reluctant to order relief that differs from that already ordered by the EPA, the primary environmental regulator, or to require the expenditure of public funds beyond what is already being spent or set aside unless the need for such expenditures has been clearly demonstrated. Defendant claims that the relief requested by plaintiffs would in reality interfere with existing enforcement activity at the MAFB plant. Defendant contends that this interference could be environmentally counterproductive and could delay or prevent the construction and operation of the TWTF, the recognized solution to the problem; accordingly, denying such relief would be consistent with the policies of the Act. See *United States v. Niagara Falls,* 706 F.Supp. 1053, 1062–64 (W.D.N.Y.1989) (denied injunction because in balancing the equities the practical engineering difficulties rendered relief requested impractical or counterproductive even though unpermitted discharges of toxic pollutants had been shown).

Plaintiffs contend that the EPA's Order on Consent is wholly inadequate to deal effectively with the environmental harm defendant's effluent has caused and still will cause. The 1985 FFCA required defendant to complete construction of the new wastewater treatment facility by October 1, 1990. Pl. Reply Brief Exh. 61. On December 17, 1990, the EPA issued its Order on Consent, requiring defendant to construct a new facility by July 31, 1994. *Id.* Exh. 29. Like the FFCA, the Order on Consent established a schedule by which defendant should achieve compliance with its permit and imposed interim effluent limitations. As part of both agreements

the EPA agreed not to enforce the limitations contained in defendant's permit. Accordingly, plaintiffs argue that there is no reason to assume that the 1990 Consent Order is a better solution to defendant's compliance problems than was the 1985 agreement. The EPA took no action to enforce compliance with the 1985 agreement for nearly four years after defendant was to have begun its compliance efforts. In the meantime, defendant continued to violate its 1977 permit and the interim limits contained in the 1985 agreement.

On August 30, 1989, the EPA met with defendant and the NJDEP to discuss defendant's compliance problems. Def. Exh. 29, p. 3. On May 9, 1990, eight months later, the EPA finally issued defendant a Notice of Violation for failure to meet the compliance schedule and interim effluent limits. *Id.* Several months of negotiations between defendant and the EPA finally culminated in the Order on Consent on December 17, 1990, which provided a new schedule which delayed the deadline for the TWTF construction for nearly four years. Plaintiffs argue, and this court is forced to agree, that nothing prevents defendant and the EPA from agreeing to put off the deadline for compliance to delay construction of the wastewater treatment plant.

Additionally, plaintiffs take strong exception to defendant's argument that the EPA is specially qualified to enforce and remedy the situation. First, the EPA is barred by the terms of the Consent Order from enforcing any limitations other than those in the order. Second, this court is not obligated to defer to the EPA's special expertise should it find that it is not doing an adequate job in protecting the environment. Yet, it is a difficult question to determine whether the EPA *is* doing an adequate job, because such decisions are highly technical.

Accordingly, this court will not set, modify, or revoke the effluent limitations that are set by the 1989 permit. This court, however, is presented with a situation where there have been substantial and continuous effluent discharges into Crosswicks Creek and its tidally-related waterways that have caused obvious harm to these plaintiffs. Therefore, this court is required to order the defendant to attempt to comply with the standards that are set in the 1989 permit. This involves no encroachment on the EPA's area of expertise. *O'Leary v. Moyer's Landfill, Inc.*, 677 F.Supp. 807, 820 (E.D.Pa 1988) (deference to EPA is unnecessary where the EPA has expressed its choice as to the proper remedy). Rather, it represents the vindication of the plaintiffs' right to bring suit when the Agency cannot or will not protect the environment.

Primarily, it should be noted that this court is reluctant to enter the regulatory domain of the EPA. Plaintiffs, however, have shown that the limits set in the 1990 Order on Consent are insufficient to protect the relevant area. This is not, as the defendant contends, an attempt by the plaintiffs to gain merely personalized relief, precluding action by this court. *Hudson River Fishermen's Ass'n v. County of Westchester*, 686 F.Supp. 1044, 1052 (S.D.N.Y.1988). The defendant has been discharging and continues to discharge toxic pollutants into our nation's waterways, damaging the environment.

As set forth previously, citizen suits are expressly permitted under the Act when they seek to enforce *"an effluent standard limitation* [or] an order issued by the administrator [of the EPA] or a state with respect to such standard or limitation...." *Hudson River*, 686 F.Supp. at 1048 (emphasis in original) (citing section 505 of the Act, 33 U.S.C. § 1365(a)(1)). The purpose of the provision was stated succinctly in *Gwaltney* as follows: "the citizen suit is meant to supplement not supplant governmental action." 484 U.S. at 60, 108 S.Ct. at 383. The defendant correctly suggests that the primary intent of the statute is to have government agencies enforce the Act, and that citizen suits are proper only "if the federal, state and local agencies fail to exercise their enforcement responsibility." *Id.* (quoting S.Rep. No. 92–414 p. 64 (1971) U.S.Code Cong. & Admin.News 1972, 3668, 3730, *reprinted in* 2 A. Legislative History of the Water Pollution Control Act Amendments of 1972, p. 1482 (1973)). Therefore, "citizen suits are barred only if the Admin-

istrator has commenced an action '*to require compliance.*'" *Id.* (emphasis added in original) (citing 33 U.S.C. § 1365(b)(1)(B)). The EPA has not commenced such an action. Rather, the EPA has not required compliance with the 1989 permit; instead, it once again deferred compliance, in this instance until 1994.

Defendant argues that the EPA has not abdicated its responsibility and that plaintiffs' action is unduly meddlesome. The court disagrees. The EPA has examined the matter and chosen not to seek enforcement of the standards set forth in the 1989 permit. Therefore, plaintiffs' suit is appropriate. "Congress made clear that citizen groups are not to be treated as nuisances or troublemakers, but rather as welcomed participants in the vindication of environmental interests." *Friends of Earth v. Carey*, 535 F.2d 165, 172 (2d Cir.1976), *cert. denied* 434 U.S. 902, 98 S.Ct. 296, 54 L.Ed.2d 188 (1977).

Defendant cites *Hudson River* for the proposition that the government is in the best position to bring suit to enforce compliance. 686 F.Supp. at 1052. In that case, however, the EPA was "actively litigating a corollary enforcement effort." *Id.* No such effort was undertaken in this case.

Similarly, defendant relies on *United States EPA v. Green Forest*, 921 F.2d 1394 (8th Cir.1990), for the proposition that this court should defer to an active EPA enforcement action. The defendant contends that the court in *Green Forest* determined that a consent decree between the EPA and the City of Green Forest precluded individual claims under the Act. *Id.* at 1403–04. *Green Forest*, however, involved the situation where a citizen's claim was dismissed because a consent decree was entered in an EPA action filed later. *Id.* at 1403. The court, therefore, held that the citizens' claim was barred by the Doctrine of Res Judicata based on the court action brought by the EPA. *Id.* In this case the EPA has not filed a civil action.

Further, the *Green Forest* court addressed the defendant's argument that because the EPA chose not to bring an action the citizens were precluded from suing for compliance. The court stated:

> This novel proposition flies in the face of the clear language of the citizens' action provision of the CWA, as well as the legislative history, which make clear that agency inaction is precisely the circumstance in which private action is appropriate. *Student Pub. Interest Research Group v. Georgia–Pacific Corp.*, 615 F.Supp. 1419, 1427 (D.N.J.1985) ("Defendant's interpretation of the act would render citizen suits impossible when they are required most: instances where an agency encourages a polluter to believe its unlawful behavior will go unpunished.").

*Green Forest*, 921 F.2d at 1405.

Therefore, in the present case, where the EPA has not filed suit to enforce the 1989 permit limitations, but rather chosen to allow continued discharges in excess of the limits, the plaintiffs' suit is appropriate.

In *Gwaltney*, the Supreme Court explained that a citizen suit would be inappropriate where "the Administrator agreed not to assess or otherwise seek civil penalties on the condition that the violator take some extreme corrective action, such as to install particularly effective but expensive machinery, that it otherwise would not be obliged to take." 484 U.S. at 60–61, 108 S.Ct. at 382–383. In the present case, defendant, in 1985, agreed to complete construction of the new plant by October 1, 1990. Thus, defendant was previously obliged to build the TWTF. Therefore, the *Gwaltney* Court's instructions may have precluded these plaintiffs from bringing suit prior to October 1, 1990, because the EPA had ordered "extreme corrective action." After October 1, 1990, however, plaintiffs are entitled to sue the defendant for the violations of its permit, because the EPA has declined to enforce the permit limitations and concomitantly deferred the defendant's pre-existing obligation to complete construction of the plant. Defendant's argument that the Administrator's deferral of compliance until 1994 served as the EPA's enforcement activity is without merit. It is apparent that the EPA turned

the other way while the defendant had an existing obligation to take corrective action. Therefore, the plaintiffs request relief from this court.

Realizing that absolute compliance with the terms of the 1989 permit is not possible, plaintiffs urge the court to order the defendant to come as close as it can to the limits set in the permit. The court will grant this request. Defendant's argument that because it cannot absolutely comply with the 1989 permit it should not have to do anything to reduce its effluent discharges ignores the plain reality that the continued pollution of the Crosswicks Creek is causing environmental damage and this harm will continue unabated until at a minimum late in 1994. Therefore, because this court finds that the defendant is in violation of its 1989 permit, summary judgment is granted in favor of the plaintiffs.

## C. *Permanent Injunctive Relief*

In order for a district court to grant preliminary injunctive relief, the moving party must demonstrate both a reasonable probability of eventual success in the litigation and that the movant will be irreparably injured before the trial if relief is not granted. *In re Arthur Treacher's Franchisee Litig.*, 689 F.2d 1137, 1143 (3d Cir. 1982). The district court must also consider the possibility of harm to other interested persons from the grant or denial of the injunction and whether ordering injunctive relief is in the public interest. *Id.* The standard for permanent injunctive relief is the same, except that the moving party must show actual success, instead of probable success, on the merits. *Amoco Prod. Co. v. Gambell*, 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 1404 n. 12, 94 L.Ed.2d 542 (1987); *Texaco Refining*, 906 F.2d at 941. The Court of Appeals for the Third Circuit has held that these standards are applicable to injunctions under the Clean Water Act. *Id.* at 941 (permanent injunction may issue under the Act only after a showing of both irreparable injury and inadequacy of legal remedies, and a balancing of competing claims of injury and the public interest).

As discussed above, plaintiffs are entitled to summary judgment on the issue of defendant's liability; thus, they have demonstrated actual success on the merits. Plaintiffs must also demonstrate that irreparable harm will result if the injunction does not issue. "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, i.e., irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545, 107 S.Ct. at 1404; *see also Yates*, 757 F.Supp. at 454.

This court has held that "any violation of . . . water quality based effluent limitations causes some degree of harm to the water quality of the receiving body of water." *PIRG v. Powell Duffryn Terminals, Inc.*, 720 F.Supp. 1158, 1162 (D.N.J.1989). Defendant's repeated discharge of pollutants at levels higher than the water quality based limitations contained in the permit harms the South Run of Crosswicks Creek by degrading the waterway and impairing its designated and existing uses.

Moreover, the pollutants that the defendant discharges are many of the same pollutants NJDEP has recognized as particularly harmful to Crosswicks Creek in the area closest to defendant's facility. The New Jersey State Water Quality Inventory Reports (305(b) Report) for May 1988 and September 1990, state that:

> The Upper Crosswicks Creek watershed appears to be moderately to severely degraded. Intensive survey results from 1984 show nutrient enrichment, with generally high bacteria counts and low dissolved oxygen saturation. . . . In addition, elevated total residual chlorine levels, noticeable chlorine odors and chloroform were found in the Upper Crosswicks Creek.

Pl. Summary Judgment Brief Exh. 47, III–117; Pl. Exh. 48, p. III–120.

In addition to discharging excessive amounts of chlorine, defendant discharges pollutants which cause nutrient enrichment (e.g. phosphate, nitrate) and pollutants which deplete the amount of oxygen in

Crosswicks Creek (e.g. BOD5, DO, and TSS). Accordingly, NJDEP has found the very type of environmental harm in Crosswicks Creek which results from the types and amounts of pollutants which defendant has discharged.

For the foregoing reasons, and after having reviewed both plaintiffs' and defendant's briefs and exhibits, the court concludes that the pollutants which defendant discharges in violation of the 1989 permit have caused and will continue to cause irreparable harm.

It is important to note that plaintiffs need not, as defendant suggests, show with scientific certainty that defendant itself has caused all of the damage to the environment. See Powell Duffryn, 720 F.Supp. at 1167 ("the fact that defendant violated its permit by discharging more pollutants than authorized means that the restoration and enhancement of the river's water quality was inhibited and therefore, the objective of the Act was frustrated."). And in Yates, 757 F.Supp. at 454, this court held that a "court may grant an injunction even where plaintiffs have not established that *measurable harm will otherwise result*" (emphasis added). Especially where "the risk of future violations is still present" this court found that "[t]he harm to plaintiffs by any further violations would be the very type of injury the Act was designed to protect." Id. at 456. Therefore, in order to decrease the extent of the irreparable harm that is being caused, this court will grant injunctive relief.

The issuance of an injunction will not cause defendant undue harm. The new plant will not be completed until November 30, 1994. Until then the defendant will be discharging toxic pollutants into Crosswicks Creek. The expenditure of $350,000 to construct the filters does not seem an excessive amount to mitigate the damage being caused. Congress anticipated that the Act would impose a significant burden on industry, but determined that the objectives of the Act necessitated imposing this burden. Federal Water Pollution Control Act Amendments of 1972, S.Rep. No. 92–414, 93d Cong., 1st Sess. Vol. 2, p. 1462. Accordingly there will be no undue harm to defendant in issuing this injunction.

Moreover, it is in the public interest to prevent further pollution in Crosswicks Creek; therefore, injunctive relief is necessary. Here, defendants have failed to comply with the discharge requirements of their permit and, thereby, the Act on numerous occasions and, consequently, have harmed the environment. Reduction in the level and duration of the harm to Crosswicks Creek and the tidally-related waterways would serve the public interest by ensuring a cleaner environment. Defendant's argument that spending $350,000 of public funds to reduce pollution would impair the public interest is not persuasive. Congress expected that large sums of money would be spent by industry and government in complying with the Act. Accordingly, the court finds that the harm to the public by the expenditure of $350,000 is outweighed by the benefit to the public in helping clean up the environment.

This court finds the issuance of an injunction necessary to bring the defendant closer to compliance with the terms of the 1989 permit.

Plaintiffs seek an injunction to require defendant to build the new wastewater treatment plant on schedule and to take further action to mitigate violations of its permit before the new plant is built. The court will order that defendant complete construction of the new plant according to the compliance schedule set forth in paragraph 2(A–E) of the 1990 Order on Consent.

Additionally, plaintiffs wish to require the new plant to comply with the 1989 permit or any new permit issued after completion of the new plant. The court, however, cannot order compliance with a permit that will be issued in the future, for it is possible that the plant will immediately comply with any new permit. Thus, such a decision is not ripe for review at this time.

Further, plaintiffs request that defendant install interim backwash filters to reduce the amount of toxic pollutants being discharged into the Crosswicks Creek. The court will order that the defendant install two Traveling Bridge Automatic Backwash Filters at defendant's existing wastewater treatment facility. As noted previously,

the installation of these filters should reduce the current levels of BOD5, TSS and phosphorus.

Moreover, the plaintiffs request that the defendant be ordered to undertake necessary maintenance and repairs to maintain and upkeep the facility. The court will grant this request.

Finally, plaintiffs ask that defendant be required to send the plaintiffs an accurate copy its completed DMRs, laboratory reports, operating logs, supplemental operating logs, and all other documents containing monitoring results, within three days of its submission of its DMRs to the NJDEP and the EPA for a period of four years from the date of the entry of this order. In view of the defendant's past noncompliance with its permit limitations, this request is also granted.

## CONCLUSION

In conclusion, this court finds that it has jurisdiction over this action, that the plaintiffs have standing to bring this suit, that the defendant is in violation of its 1989 permit and that the 1990 Order on Consent is not sufficient to remedy the harm caused by the defendant's violations; accordingly, permanent injunctive relief is appropriate. Therefore, the court will grant plaintiffs' motion for partial summary judgment as to defendant's liability and will issue permanent injunctive relief. The court will stay defendant's cross-motion for summary judgement on the availability of civil penalties. An order accompanies this opinion. No costs.

## ORDER

Upon consideration of plaintiffs' motion for partial summary judgment and permanent injunctive relief, the arguments of counsel, and the briefs and exhibits submitted by the parties in support or opposition thereto,

IT IS on this 23rd day of September, 1991,

ORDERED that plaintiffs' motion for partial summary judgment on the issue of defendant's liability for its violations of the Federal Water Pollution Control Act be and hereby is granted; and it is further

ORDERED that defendant's motion for summary judgment on the availability of civil penalties be and hereby is stayed; and it is further

ORDERED that plaintiffs' motion for a permanent injunction be and hereby is granted; and it is further

ORDERED that defendant be and hereby is ordered to comply with the Tertiary Wastewater Treatment Facility compliance schedule contained in the October 26, 1990, "Order on Consent" entered into between the defendant and the Environmental Protection Agency (EPA), set forth in paragraph 2(A–E); and it is further

ORDERED that defendant undertake immediate measures at its existing wastewater treatment facility to maximize compliance with the current 1989 NJPDES permit, or the effluent limitations in any future NJPDES permit(s), and that such actions include, but not be limited to, the installation at defendant's existing wastewater treatment facility of a portable Traveling Bridge Automatic Backwash filter of the sizing described in the "Revised 30% Concept Design Analysis" (April 1990) for the Tertiary Wastewater Treatment Facility, drafted by Malcolm Pirnie under U.S. Army Corps of Engineers, Philadelphia District, Contract No. DACA 61–89–C–0001, with an additional portable Traveling Bridge Automatic Backwash filter of the same sizing installed in a stand-by capacity and that defendant shall install all necessary construction, piping, pumping, lighting, electrical equipment, freeze protection and other support equipment to connect the filters to the existing wastewater treatment facility and to ensure their proper function; and it is further

ORDERED that defendant complete all remedial measures at its existing wastewater treatment facility which were discussed in defendant's response to plaintiffs' Interrogatory 11(a) of Plaintiffs' First Set of Interrogatories within 60 (sixty) days of this Order; and it is further

ORDERED that defendant undertake all necessary maintenance and repairs at the existing plant to continue the level of operation of the existing facility so that it

achieves a level of compliance which is as close as possible to the limitations in defendant's 1989 NJPDES Permit, No. NJ 0022578; and it is further

ORDERED that defendant properly complete its Discharge Monitoring Reports (DMRs), including, but not limited to, correctly filling out the DMRs so as to include all permit violations and other data required by defendant's permit, the applicable regulations and the DMR form and shall submit these DMRs to the New Jersey Department of Environmental Protection (NJDEP) and EPA; and it is further

ORDERED that defendant submit Non–Compliance Reports in accordance with its 1989 NJPDES permit to NJDEP and EPA; and it is further

ORDERED that defendant comply with the monitoring requirements of its 1989 NJPDES permit; and it is further

ORDERED that defendant submit to plaintiffs, for a period of four years from the entry of this Order, its DMRs, laboratory reports, operating logs, supplemental operating logs and all other documents containing monitoring results within three days of its submission of its DMRs to NJDEP and EPA.