William **FRILLING**, et al., Plaintiffs,

v.

**VILLAGE OF ANNA**

and

**Honda of America Manufacturing, Inc., Defendants.**

No. C–3–95–194.

United States District Court, S.D. Ohio, Western Division.

March 14, 1996.

Rodney Robinson Blake, Jr., Sidney, OH, Kevin Halsey, A.J. Blake, Portland, OR, for William Frilling, Judy Frilling, Ralph Katterhenry.

Gordon Dale Arnold, Freund, Freeze and Arnold, Dayton, OH, for Village of Anna.

Theodore Allen Boggs, Elizabeth E. Tulman, Mary Ellen Fairfield, Vorys Sater Seymour & Pease, Columbus, OH, for Honda of America Manufacturing Inc.

DECISION AND ENTRY SUSTAINING MOTION OF DEFENDANT HONDA OF AMERICA MANUFACTURING, INC., FOR PARTIAL SUMMARY JUDGMENT (DOC. # 11) AS TO COUNTS TEN, ELEVEN, AND TWELVE; DECISION AND ENTRY OVERRULING MOTION OF DEFENDANT VILLAGE OF ANNA FOR PARTIAL SUMMARY JUDGMENT (DOC. # 12) AS TO COUNTS ONE, TWO, THREE, FOUR, FIVE, SIX AND SIXTEEN; PLAINTIFFS' REQUEST FOR ORAL ARGUMENT (DOC. # 15) ON MOTION OF DEFENDANT VILLAGE OF ANNA FOR PARTIAL SUMMARY JUDGMENT (DOC. # 12) DENIED; DEFENDANT VILLAGE OF ANNA'S REQUEST FOR ORAL ARGUMENT (DOC. # 18) ON ITS MOTION FOR PARTIAL SUMMARY JUDGMENT (DOC. # 12) DENIED; PLAINTIFFS' COUNSEL INSTRUCTED TO AUTHENTICATE, PURSUANT TO RULE 56 OF THE FEDERAL RULES OF CIVIL PROCEDURE, SPECIFIED EXHIBITS WITHIN TWENTY (20) DAYS OF THE DATE OF THIS DECISION; LEAVE OF COURT GRANTED FOR DEFENDANT VILLAGE OF ANNA TO FILE SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT, WITHIN TWENTY (20) DAYS OF THE DATE OF THIS DECISION, RELATING TO THE EFFECT OF THE CONSENT ORDER'S CIVIL LIABILITY PROVISION ON DEFENDANT VILLAGE'S POTENTIAL CIVIL LIABILITY FOR VIOLATIONS OCCURRING BEFORE THE DATE OF THE CONSENT ORDER

RICE, Chief Judge.

This case arises from circumstances surrounding the allegedly impermissible discharge of pollutants into Clay Creek by Defendant Village of Anna ("Village"), and indirectly by Defendant Honda of America Manufacturing, Inc. ("Honda"), owner of the Honda Engine Plant ("Plant") located near Anna, Ohio, which discharges sanitary and industrial wastewater to Defendant Village's publicly owned treatment works ("POTW"). Plaintiff William Frilling, Plaintiff Judy Frilling, and Plaintiff Ralph Katterhenry ("Plaintiffs") own land through which Clay Creek runs. In their Complaint (Doc. #1), they allege the following: Defendant Village has violated and will continue to violate its National Pollutant Discharge Elimination System ("NPDES") permit (number 1PB00004*DD) by exceeding the following final effluent limitations contained in the permit: suspended solids, oil and grease, ammonia, fecal coliform, carbonaceous biochemical oxygen demand ("CBOD5") and dissolved oxygen, in violation of 33 U.S.C. § 1311 and O.R.C. §§ 6111.04 and 6111.07 (*Count One*, violations of final effluent limitations in NPDES permit, against Defendant Village); Defendant Village has violated and will continue to violate the general effluent limitations contained in its NPDES permit[1] by its discharges into Clay Creek (*Count Two*, violations of general effluent limitations in NPDES permit, in reference to water quality standards, against Defendant Village); Defendant Village has violated and will continue to violate the sludge disposal limi-

---

1. These general effluent limitations require the effluent be free, at all times of substances:

(A) In amounts that will settle to form putrescent, or otherwise objectionable, sludge deposits; or that will adversely affect aquatic life or water fowl;

(B) Of an oily, greasy, or surface-active nature, and of other floating debris, in amounts that will form noticeable accumulations of scum, foam or sheen;

(C) In amounts that will alter the natural color or odor of the receiving water to such degree as to create a nuisance;

(D) In amounts that either singly or in combination with other substances are toxic to human, animal, or aquatic life;

(E) In amounts that are conducive to the growth of aquatic weeds or algae to the extent that such growths become inimical to more desirable forms of aquatic life, or create conditions that are unsightly, or constitute a nuisance in any other fashion; and

(F) In amounts that will impair designated instream or downstream water uses.

Plaintiffs' Memorandum in Opposition (Doc. # 15), Exhibit T, NPDES Permit No. 1PB00004*DD, Part III, sec. 2.

tations in its NPDES permit[2] by its discharges into Clay Creek (*Count Three,* sludge disposal NPDES permit violations, against Defendant Village); Defendant Village has violated and will continue to violate § 301 of the Clean Water Act ("CWA"), as codified at 33 U.S.C. § 1311, by discharging sulfates into Clay Creek although its NPDES permit contains no parameters which authorize such discharges (*Count Four,* sulfates CWA violations, against Defendant Village); Defendant Village has violated and will continue to violate regulations promulgated to implement § 405 of the CWA, as codified at 33 U.S.C. § 1345, by its discharge of sewer sludge into Clay Creek (*Count Five,* sewer sludge CWA violations, against Defendant Village); Defendant Village has violated and will continue to violate state water quality standards in violation of 33 U.S.C. § 1312,[3] as those standards are defined by O.A.C. § 3745–1–04 and O.A.C. § 3745–1–05(A), by its discharges into Clay Creek (*Count Six,* water quality CWA violations, against Defendant Village); a state law claim of public nuisance, against Defendant Village (*Count Seven*); a state law claim of private nuisance, against Defendant Village (*Count Eight*); a state law claim of trespass, against Defendant Village (*Count Nine*); Defendant Honda has violated and will continue to violate its Indirect Discharge permit (number 1PB00004100*AP) by causing impermissible "interference"[4]

with Defendant Village's POTW, a pretreatment permit violation (*Count Ten,* Indirect Discharge permit violations by causing impermissible interference with Village's POTW, against Defendant Honda); Defendant Honda has violated and will continue to violate its Indirect Discharge permit by slug loading, a pretreatment permit violation (*Count Eleven,* slug loading Indirect Discharge permit violations, against Defendant Honda); Defendant Honda has violated and will continue to violate 40 C.F.R. § 403.5(c)(1) and § 403.5(b)(4), which prohibit interference with a POTW, a violation of pretreatment standards (*Count Twelve,* regulatory violations, against Defendant Honda); a state law claim of private nuisance, against Defendant Honda (*Count Thirteen*); a state law claim of public nuisance, against Defendant Honda (*Count Fourteen*); and a state law claim of trespass, against Defendant Honda (*Count Fifteen*). In a Supplemental Complaint (Doc. # 25) filed on January 26, 1996, Plaintiffs set forth an additional claim under 33 U.S.C. § 1311 against Defendant Village, for impermissible discharges of sewage, occurring subsequent to May 12, 1995 (*Count Sixteen,* post-complaint sewage NPDES permit violations, against Defendant Village).

There are currently two motions pending before this Court: Defendant Honda's Motion for Partial Summary Judgment[5] (Doc.

2. This permit requirement provides as follows: "Collected screenings, slurries, sludges and other solids shall be disposed of in such a manner as to prevent entry of those wastes into waters of the State. For publicly owned treatment works these shall be disposed of in accordance with the approved OEPA Sludge Management Plan." Plaintiffs' Memorandum in Opposition (Doc. # 15), Exhibit T; NPDES Permit No. 1PB00004*DD, Part III, sec. 21.

3. Although Plaintiffs base this Count on 33 U.S.C. § 1312 ("Water quality related effluent limitations"), it appears to this Court that this claim would be more properly based on § 1313 ("Water quality standards and implementation plans"), which governs the development and implementation of the state standards relied upon by the Plaintiffs.

4. Honda's Indirect Discharge permit defines "interference" as:

a discharge which, alone or in conjunction with a discharge or discharges from other sources, both: (1) inhibits or disrupts the POTW, its treatment processes or operations, or its sludge processes, use or disposal; and (2) therefore is a cause of a violation of any requirement of the POTW's NPDES permit (including an increase in the magnitude or duration of a violation) or of the prevention of sewage sludge use or disposal in compliance with the following statutory provisions and regulations or permits issued thereunder (or more stringent local regulations): Section 405 of the Clean Water Act....

Defendant Honda's Motion for Summary Judgment (Doc. # 11), Exhibit 2–B, Indirect Discharge Permit No. 1PB00004100*AP, Part III, sec. 1.

5. Although Defendant Honda's motion is styled as a Motion for Summary Judgment, this Court will treat it as a Motion for Partial Summary

# 11) as to Counts Ten, Eleven, and Twelve; and Defendant Village's Motion for Partial Summary Judgment (Doc. # 12) as to Plaintiffs' federal CWA claims, which are contained in Counts One, Two, Three, Four, Five, Six and Sixteen. This Court will now rule on both of these motions.[6]

This Court has federal question jurisdiction, under 28 U.S.C. § 1331, over those of Plaintiffs' claims which are based on the CWA and the regulations implementing the Act (Counts One, Two, Three, Four, Five, Six, Ten, Eleven, Twelve and Sixteen). This Court may properly exercise its supplemental jurisdiction over Plaintiffs' remaining state-law claims (Counts Seven, Eight, Nine, Thirteen, Fourteen and Fifteen) pursuant to 28 U.S.C. § 1367, as these claims are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

Before focusing on the merits of the motions, the Court will set forth the relative burdens of the parties once a motion for summary judgment is made. Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id.* at 323, 106 S.Ct. at 2552–53. *See also Boretti v. Wiscomb*, 930 F.2d 1150, 1156 (6th Cir.1991) (The moving party has the "burden of showing that the pleadings, depositions, answers to interrogatories, admissions and affidavits in the record, construed favorably

to the non-moving party, do not raise a genuine issue of material fact for trial." quoting *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 [6th Cir.1987] ). The burden then shifts to the non-moving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)). Read together, *Liberty Lobby* and *Celotex* stand for the proposition that a party may move for summary judgment by demonstrating that the opposing party will not be able to produce sufficient evidence at trial to withstand a directed verdict motion (now known as a motion for judgment as a matter of law. Fed.R.Civ.P. 50). *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the non-moving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324, 106 S.Ct. at 2553. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Summary judgment shall be denied "[i]f there are … 'genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party.' " *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir.1992). Of course, in

---

Judgment, as Defendant Honda has only requested summary judgment on three of the six counts against it.

**6.** Both Plaintiffs (Doc. # 15) and Defendant Village (Doc. # 18) requested oral argument on

Defendant Village's Motion for Partial Summary Judgment (Doc. # 12). This Court deems oral argument on the relevant issues to be unnecessary, and therefore denies these requests.

determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all *reasonable* inferences in the favor of that party. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14 (emphasis added). If the parties present conflicting evidence, a court may not decide which evidence to believe, by determining which parties' affiants are more credible; rather, credibility determinations must be left to the fact-finder. 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure, § 2726. In ruling on a motion for summary judgment (in other words, in determining whether there is a genuine issue of material fact), "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller,* 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied,* 494 U.S. 1091, 110 S.Ct. 1839, 108 L.Ed.2d 967 (1990). *See also, L.S. Heath & Son, Inc. v. AT & T Information Systems, Inc.,* 9 F.3d 561 (7th Cir.1993); *Skotak v. Tenneco Resins, Inc.,* 953 F.2d 909, 915 n. 7 (5th Cir.), *cert. denied,* 506 U.S. 832, 113 S.Ct. 98, 121 L.Ed.2d 59 (1992) ("Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment...."). Thus, a court is entitled to rely, in determining whether a genuine issue of material fact exists on a particular issue, only upon those portions of the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted, specifically called to its attention by the parties.

## I. Background Facts

This Court will take this statement of facts from the following affidavits, and properly authenticated court documents, letters, and permits: affidavit of Jon Hulsmeyer, Service Director for Defendant Village ("Hulsmeyer Affidavit") (Doc. # 12, Exh. A); affidavit of David M. Kreglow, Senior Manager for Plant Services at the Anna Engine Plant (Honda) ("Kreglow Affidavit") (Doc. # 11, Exh. 2); Defendant Honda's Indirect Discharge permit number 1PB00004100*AP (*Id.,* Exh. 2–B); Defendant Honda's Indirect Discharge permit number 1PB00004100*BP (*Id.,* Exh. 2–C); letter dated June 28, 1993, from OEPA to Defendant Honda ("6/28/93 Letter") (*Id.,* Exh. 2–D); letter dated October 24, 1994, from Plaintiffs' counsel to Defendant Village and Defendant Honda, giving statutory 60-day notice of citizen suit under CWA ("Notice Letter") (*Id.,* Exh. 2–G); letter dated October 27, 1994, from Defendant Honda to Plaintiffs' counsel ("10/27/94 Letter") (*Id.,* Exh. 2–H); affidavit of Margaret A. Malone, Assistant Ohio Attorney General ("Malone Affidavit") (*Id.,* Exh. 3); State of Ohio's Complaint against Defendant Village, filed in the Shelby County Court of Common Pleas on December 23, 1994 ("State's Complaint") (Doc. # 12, Exh. D); Consent Order, filed in the Shelby County Court of Common Pleas on December 23, 1994 ("Consent Order") (*Id.,* Exh. E); affidavit of Plaintiff William Frilling ("Frilling Affidavit") (Doc. # 16, Exh. A); affidavit of Plaintiff Ralph Katterhenry ("Katterhenry Affidavit") (*Id.,* Exh. B); Defendant Village's Self–Monitoring Reports from January to July, 1995 ("1995 Reports") (Doc. # 12, Exh. A–1); letter dated February 18, 1993, from the Ohio Environmental Protection Agency ("OEPA") to Defendant Village ("2/18/93 Letter") (*Id.,* Exh. A–2); supplemental affidavit from Jon Hulsmeyer ("Hulsmeyer Supp. Affidavit") (Doc. # 18, Exh. F); letter dated April 5, 1995, from the United States Environmental Protection Agency ("United States EPA") to Defendant Village ("4/5/95 Letter") (*Id.,* Exh. 1); and a letter dated September 5, 1995, from the United States EPA to Defendant Village ("9/5/95 Letter") (*Id.,* Exh. 2).

In opposing Defendants' Motions for Partial Summary Judgment, Plaintiffs have offered evidentiary materials which were *not* properly authenticated, as is required by Rule 56 of the Federal Rules of Civil Procedure. Although this Court would normally refrain from considering such materials, it will exercise its discretion to consider them at this time because, with one exception,[7]

---

**7.** In its Reply, (Doc. # 17, p. 12) Defendant Honda did object to Plaintiffs' charts and summaries

relating to the existence of ongoing violations (Doc. # 16, Exh. Q, R), on the basis of their

Defendants have not objected to these materials. *See Wiley v. United States*, 20 F.3d 222, 226 (6th Cir.1994) ("If a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived ...").

*However*, this Court's consideration of the following non-authenticated exhibits offered by Plaintiffs is contingent upon Plaintiffs' counsel's submission, within twenty (20) days of the date of this decision, of *properly authenticated* sworn or certified copies of each of the non-authenticated exhibits listed below. If this condition is not met, this Court *will revisit* its decision to consider the following materials: letter dated August 2, 1994, from Plaintiffs' counsel to the Ohio Attorney General's Office ("8/2/94 Letter") (Doc. # 15, Exh. D); letter dated September 20, 1994, from Plaintiffs' counsel to the Ohio Attorney General's Office ("9/20/94 Letter") (*Id.*, Exh. E); letter dated October 14, 1994, from Jack Van Kley, Ohio Attorney General's Office, to Plaintiffs' counsel ("10/14/94 Letter") (*Id.*, Exh. F); letter dated October 25, 1994, from Plaintiffs' counsel to Van Kley ("10/25/94 Letter") (*Id.*, Exh. H); letter dated December 22, 1994, from Plaintiffs' counsel to Defendant Village and Ohio Attorney General's office ("12/22/94 Letter") (*Id.*, Exh. J); Notice of Errata dated December 30, 1994, from Ohio Attorney General's office to Shelby County Court of Common Pleas ("Notice of Errata") (*Id.*, Exh. S); and Defendant Village's NPDES permit number 1PB00004*DD ("NPDES permit") (*Id.*, Exh. T.). Plaintiffs should be aware that such revisitation might well cause this Court to void its order herein.

This case centers around the allegedly impermissible discharges of wastewater into Clay Creek, in Anna, Ohio. Defendant Honda is authorized to discharge sanitary and industrial wastewater into Defendant Village's publicly owned treatment works ("POTW"), under the conditions stated in Indirect Discharge permit (number 1PB00004100*AP), issued on April 19, 1990, by the OEPA (Kreglow Affidavit, Attach. B).[8] In addition, Defendant Honda possesses a second NPDES permit (number 1IN00143*AD), which is not at issue in this case, and which authorizes Defendant Honda to discharge wastewater into Finkenbine Ditch (Kreglow Affidavit, Attach. A). Defendant Village is authorized to discharge wastewater from its POTW into Clay Creek, under the terms of its NPDES permit, issued by the OEPA on January 10, 1991 (NPDES Permit). Plaintiffs are residents of Defendant Village, and own land through which Clay Creek runs (Frilling Affidavit, Katterhenry Affidavit).

On February 18, 1993, the OEPA notified Defendant Village that it was in violation of its NPDES permit (2/18/93 Letter). On June 28, 1993, the OEPA similarly notified Defendant Honda that it was in violation of its Indirect Discharge permit (Kreglow Affidavit, Attach. D). At some point thereafter, Defendant Honda and Defendant Village began meeting to discuss the alleged violations, occasionally involving representatives from the OEPA and the Ohio Attorney General's office in their discussions (Hulsmeyer Affidavit). Assistant Ohio Attorney General Margaret A. Malone was involved in these negotiations (Malone Affidavit).

On August 2, 1994, Plaintiffs' counsel, Rodney Blake, requested information from the Ohio Attorney General's office in regard to any enforcement action being taken (8/2/94 Letter). Several weeks later, Blake wrote a second letter to the Ohio Attorney General's office, protesting because he had not been sent copies of the proposed court order or compliance schedule (9/20/94 Letter). Jack Van Kley, Chief of the Ohio Attorney General's Environmental Enforcement Section, responded by refusing either to provide Blake with copies of the proposed court order or

---

admissibility. Because these charts and summaries were not properly authenticated under Rule 56 of the Federal Rules of Civil Procedure, this Court SUSTAINS Defendant Honda's objection, and does not consider these exhibits in its decision herein.

8. This permit expired on April 16, 1995, and was replaced by Permit Number 1PB00004100*BP, effective April 19, 1995.

compliance schedule, or to allow his clients to participate in the ongoing negotiations. Van Kley did, however, agree to provide other relevant documentation, and advised Blake of his clients' rights to sue under the Clean Water Act's citizen suit provision (10/14/94 Letter).

On October 24, 1994, Plaintiffs' counsel sent a letter to Defendant Village and Defendant Honda, advising them of his intent to sue under the Clean Water Act's citizen suit provision, and providing them with the required 60–day notice (Notice Letter). Defendant Honda responded a few days later, in a letter which disputed Plaintiffs' allegations (10/27/94 Letter). On October 25, 1994, Blake wrote again to Van Kley, reiterating his request that his clients be allowed to intervene in the negotiation process, and be given the opportunity to review and comment on any consent order [that would be developed] (10/25/94 Letter).

On December 22, 1994, Plaintiffs' counsel wrote to Defendant Village and the Ohio Attorney General's office, stating that he was aware that an agreement had been reached between the parties, and requesting an opportunity to intervene prior to submission of the Consent Order, "so the judge can make a determination as to the reasonableness of such an agreement." (12/22/94 Letter). This letter was hand-delivered to Defendant Village, and sent by priority mail to the Ohio Attorney General's office.

On the very next day, December 23, 1994, the State of Ohio filed a civil enforcement action against Defendant Village, in the Shelby County Court of Common Pleas (State's Complaint). This Complaint alleged that Defendant Village had violated chapter 6111 of the Ohio Revised Code by violating its final effluent limitations for: suspended solids (Count One), CBOD5 (Count Two), fecal coliform (Count Three), oil and grease (Count Four), ammonia (Count Five), and dissolved oxygen (Count Six).

Along with the Complaint, the State simultaneously filed a Consent Order, which was signed by Judge Schmitt and entered later that same day (Consent Order). Accordingly, this civil action was commenced and ended on the very same day. Notably, a copy of Defendant Village's NPDES permit was not submitted to the Court until December 30, 1994 (Notice of Errata). Plaintiffs were not given any opportunity to intervene in this enforcement action.[9]

The terms of the Consent Order require Defendant Village to pay a penalty of $50,-000,[10] and to meet a compliance schedule for constructing new treatment facilities, which are due to be completed by June 30, 1998. The Consent Order provides for stipulated penalties if this schedule is not met.

The Consent Order further provides that while these facilities are being constructed, Defendant Village is excused from complying with the final effluent limitations contained in its NPDES permit, and need only comply with one of two sets of interim limitations. The first set of interim limitations ("Interim A") is applicable until December 31, 1996, at which time Defendant Honda is scheduled to complete construction of a six-mile pipeline to the City of Sidney's POTW, for the purpose of redirecting its wastewater to Sidney. A second set of interim limitations ("Interim B") will become applicable after Defendant Honda redirects its discharge to Sidney, and will be in effect until June 30, 1998, at which time the final effluent limitations in the NPDES permit will become applicable.

It is useful, at this juncture, to compare the final effluent limitations in the NPDES permit, the first set of interim limitations, and the second set of interim limitations, in regard to the parameters which are the subject of this lawsuit, for both the permitted

---

**9.** This Court notes here that although both parties have stated in their briefs that the Shelby County Court of Common Pleas, itself, denied Plaintiffs the opportunity to intervene, this Court has not considered this purported fact in its analysis because, to this Court's knowledge, it is not evidenced in the record.

**10.** The OEPA and Defendant Village negotiated the amount of this fine (Hulsmeyer Supp. Affidavit). The OEPA originally proposed a fine of $250,000, but the Village refused to accept this amount, and negotiated it down to $50,000. Hulsmeyer explains that "this figure was based upon the fact that the Village is a small community with limited resources." *Id.*

30–day concentration limitations,[11] and the 7–day concentration limitations [12]:

| Parameter | NPDES Permit | | Interim A | | Interim B | |
|---|---|---|---|---|---|---|
| | 30 day | 7 day | 30 day | 7 day | 30 day | 7 day |
| 1. Suspended solids | | | | | | |
| (summer) | 15 | 23 | 62 | 93 | 30 | 45 |
| (winter) | 25 | 40 | 75.2 | 112.8 | 30 | 45 |
| 2. Oil and grease | not to exceed 10 at any time | | not to exceed 10 at any time | | not to exceed 10 at any time | |
| 3. Ammonia | | | | | | |
| (summer) | 4 | 6 | 25 | 37.5 | 25 | 37.5 |
| (winter) | 13 | 19.5 | 15.7 | 23.5 | 25 | 37.5 |
| 4. Fecal coliform | 1000 | 2000 | 1000 | 2000 | 1000 | 2000 |
| 5. CBOD5 | | | | | | |
| (summer) | 10 | 15 | 50 | 75 | 25 | 40 |
| (winter) | 20 | 30 | 38.7 | 58 | 25 | 40 |
| 6. Dissolved oxygen | not less than 5.0 mg/l | | no specified level | | no specified level | |

During the period of January through July, 1995, Defendant Village has not violated the interim limitations set forth in the Consent Order (Hulsmeyer Affidavit). However, Defendant Village appears to concede that it *has* violated the final effluent limitations contained in its NPDES permit, by stating that: "To date, the Village has complied with its interim limits, and is close to complying with its NPDES permit limits." (Hulsmeyer Supp. Affidavit).

On April 5, 1995, the United States EPA requested that Defendant Village submit information regarding its discharges to Clay Creek (4/5/95 Letter). On September 5, 1995, after this lawsuit was filed, the United States EPA notified Defendant Village that it had complied with this request for information, and that "based on current information available, this action [apparently referring to the Information Request] has been placed on inactive status." (9/5/95 Letter).

On May 12, 1995, Plaintiffs filed this lawsuit.

## II. Defendant Honda's Motion for Partial Summary Judgment (Doc. # 11)

Defendant Honda has moved for summary judgment on Plaintiffs' three claims set forth against it: Count Ten (Indirect Discharge permit violations, by causing impermissible interference with Village's POTW); Count Eleven (slug loading Indirect Discharge permit violations); and Count Twelve (regulato-

**11.** This refers to "the arithmetic average (weighted by flow) of all the determinations of daily concentration made during the 30–day period. If only one sample is taken during the 30–day period, its concentration is the 30–day concentration for that 30–day period." Plaintiffs' Memorandum in Opposition (Doc. # 15), Exhibit T, NPDES Permit No. 1PB00004*DD, Part III, sec. 1.

**12.** This refers to "the arithmetic average (weighted by flow) of all the determinations of daily concentration made during the 7–day period. If only one sample is taken during the 7–day period, its concentration is the 7–day concentration limitation for that 7–day period." Plaintiffs' Memorandum in Opposition (Doc. # 15), Exhibit T, NPDES Permit No. 1PB00004*DD, Part III, sec. 1.

ry violations). All of these claims pertain to either the Clean Water Act, or regulations promulgated thereunder. Before turning to the merits of this motion, this Court will briefly set forth the law to be applied.

The Clean Water Act, codified at 33 U.S.C. § 1251 *et seq.,* was enacted in 1972 "to restore and maintain the chemical, physical, and biological integrity of the Nation's waters." § 1251(a). The Act allows states to establish programs in conformance with federal guidelines, under which they may issue NPDES permits that authorize the discharge of pollutants, subject to enumerated conditions. § 1342. Holders of state NPDES permits are subject to both federal and state enforcement. § 1319, § 1342(b)(7). Citizen suits against persons who violate such permits are also authorized by the Act, in certain circumstances. § 1365(a)(1).

Specifically relevant to the present motion is the following provision, which governs, *inter alia,* citizen suits against permit violators:

No action may be commenced—

(1)(A) prior to sixty days after the plaintiff has given notice of the alleged violation (i) to the Administrator, (ii) to the State in which the alleged violation occurs, and (iii) to any alleged violator of the standard, limitation, or order ...

. . . .

Notice under this subsection shall be given in such manner as the Administrator shall prescribe by regulation.

33 U.S.C. § 1365(b)(1)(A). The Administrator of the United States EPA has issued the following regulations pertaining to the required contents of notice given under § 1365(b)(1)(A):

Notice regarding an alleged violation of an effluent standard or limitation or of an order with respect thereto, shall include *sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have constituted a violation,* the person or persons respon-

sible for the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice.

40 C.F.R. § 135.3(a) (emphasis added).

In their October 24, 1994, Notice Letter, Plaintiffs set forth a number of allegations against Defendant Honda. These allegations suffer from a regrettable lack of clarity, and appear to confuse the two permits issued to that Defendant.[13] For example, the letter contains the following allegation:

Honda has been, and continues to be in violation of ... its NPDES permit ... because of the excessive amounts of effluent ... that Honda routinely discharges into the [V]illage's waste treatment facility, and the [V]illage's inability to adjust to the type of effluent loads that Honda is discharging.

Notice Letter, Doc. # 16, Exh. G. This allegation describes Defendant Honda's discharge of effluent to the Village's POTW, which is governed by Defendant Honda's Indirect Discharge permit, but specifically references Defendant Honda's NPDES permit, which governs Defendant Honda's unrelated direct discharges to Finkenbine Ditch.

This confusion permeates the two sections of the Notice Letter which pertain specifically to Defendant Honda. In Section IV, entitled "Honda's NPDES Permit Violations," Plaintiffs quote portions of Defendant Honda's NPDES permit, and then apply the terms and conditions of that permit to allegedly impermissible discharges into both Finkenbine Ditch, *and* the Village's POTW. In Section V, Plaintiffs made reference to Ohio's regulations pertaining to water quality standards. O.A.C. § 3745–1–04, § 3745–1–05(B). Importantly, however, *at no point* in the Notice Letter do Plaintiffs refer to *either* Defendant Honda's Indirect Discharge permit, which provides the basis for Counts Ten and Eleven, *or* 40 C.F.R. § 403.5(a)(1) and § 403.5(b)(4), upon which Count Twelve is based.

13. As discussed earlier, Defendant Honda possesses two OEPA permits: (1) an Indirect Discharge permit (number 1PB00004100*AP, replaced on April 19, 1995, by number 1PB00004100*BP) which authorizes it to dis-

charge sanitary and industrial wastewater into Defendant Village's POTW; and (2) a NPDES permit (number 1IN00143*AD) which authorizes it to discharge wastewater into Finkenbine Ditch.

Although Plaintiffs fail to specifically reference the permit and regulations under which they ultimately brought suit, thereby failing to identify the specific standard(s), limitation(s), or order(s) alleged to have been violated, their intent to sue Defendant Honda for its discharges into the Village's POTW arguably can, however, be inferred from various passages in the letter. For example, Plaintiffs allege that

> Honda['s] discharges destroy the downstream environment by burdening the Anna Publicly Owned Treatment Works (POTW) with an effluent load of such a quantity and foulness that the POTW is unable to provide adequate treatment. As stated previously, samples taken from the creek bed just downstream of the Plant showed a thick coating of black, noxious, sludge that was several feet deep in some places. The surface of the water is often covered with an oily film and foamy debris. The once-clear Clay Creek now causes headaches and nausea to residents living in its vicinity. There is no longer a riparian ecosystem along Clay Creek.

Notice Letter, p. 4. In addition, Plaintiffs rely on Defendant Honda's response to their Notice Letter—which discusses its Indirect Discharge Permit—to argue that Defendant Honda was able to identify the source of Plaintiffs' concerns (10/27/94 Letter). The issue presently before this Court, is whether the contents of this Notice Letter, in regard to Defendant Honda, were sufficient, under § 1365(b)(1)(A) and 40 C.F.R. § 135.3(a).

This issue requires this Court to decide whether Plaintiffs must strictly comply with this statute and regulations, by clearly identifying the specific standard, limitation, or order alleged to have been violated, *or* whether it is sufficient to give "notice in fact," which provides sufficient information to allow the recipient to identify the specific standard, limitation or order alleged to have been violated, even though the notice does not itself clearly make that identification.

Plaintiffs argue that under the CWA, it is sufficient to provide "notice in fact." A number of cases have supported this interpretation. *See York Center Park Dist. v. Krilich*, No. 89–C–6000, 1993 WL 114628, at *3 (N.D.Ill.1993) ("Because the notice specifically stated that the violations occurred on property owned or 'controlled' by Defendants, it is only reasonable that Defendants were aware that the CWA violations may also concern their control over Lake Yelenich"); *Chesapeake Bay Found. v. Bethlehem Steel Corp.*, 652 F.Supp. 620, 628 (D.Md. 1987) ("courts have adopted a pragmatic approach to the statutory requirement of 60–days' notice ... [dismissal is not necessary] as long as the defendant and the regulatory agencies involved had actual notice for more than sixty days"); *National Wildlife Federation v. Consumers Power Co.*, 657 F.Supp. 989, 998 (W.D.Mich.1987) ("although it could have been more specific, the notice satisfied regulatory requirements ... plaintiff gave timely and substantially complete, if not complete, notice"), *rev'd on other grounds*, 862 F.2d 580 (6th Cir.1988) (reaching the merits of the case, and not discussing the issue of notice); *Kitlutsisti v. Arco Alaska, Inc.*, 592 F.Supp. 832, 842 (D.Alaska 1984) ("§ 1365(b) should be interpreted pragmatically by the courts, not as a technical roadblock to citizen suits. So long as plaintiffs substantially comply with its terms, courts may assume jurisdiction of the dispute.").

However, in a decision which bears significantly on this issue, the Supreme Court interpreted a provision of the Resource Conservation and Recovery Act ("RCRA"), which is identical in its terms to the citizen suit provision of the CWA, and held that strict compliance with the provision is required. *Hallstrom v. Tillamook County*, 493 U.S. 20, 110 S.Ct. 304, 107 L.Ed.2d 237 (1989). The plaintiffs in *Hallstrom* had failed to comply with the requirement that they formally notify the state and federal agencies of their intent to sue, at least 60 days before filing the action. Instead, after the action was filed, the plaintiffs belatedly notified the agencies of their intent to sue. The lower court allowed the case to proceed to trial, reasoning that because neither agency expressed any interest in pursuing an enforcement action, it would be a waste of judicial resources to dismiss the action. The Ninth Circuit reversed on appeal, holding that

courts must strictly construe the notice requirement.

The Supreme Court affirmed the Ninth Circuit's decision, holding that "the notice and 60-day delay requirements are mandatory conditions precedent to commencing suit under the RCRA citizen suit provision; a district court may not disregard these requirements at its discretion." 493 U.S. at 31, 110 S.Ct. at 311. In regard to the notice itself (as opposed to the contents of the notice), the Court rejected arguments that it apply a "flexible or pragmatic construction" to the citizen suit provision, stating that "[t]he equities do not weigh in favor of modifying statutory requirements when the procedural default is caused by petitioners' failure to take the minimal steps necessary to preserve their claims." Id. at 26–27, 110 S.Ct. at 308–09. The Court further rejected the argument that a strict interpretation would waste judicial resources. Id. at 32, 110 S.Ct. at 312. However, the Court did point out that plaintiffs could still obtain their "day in court" by properly filing notice, and then recommencing suit. Id.

Although Hallstrom did not interpret the specific provision of the CWA which is at issue herein, the Sixth Circuit has applied the Hallstrom decision to a case involving an identical citizen suit provision in another Act. See Atlantic States Legal Found. v. United Musical Instruments, 61 F.3d 473, 478 (6th Cir.1995) ("As the structure of EPCRA's [Emergency Planning and Community Right-to-Know Act] notice provision is substantively identical to the analogous provision of RCRA, it follows that sufficient notice is also a mandatory prerequisite to filing an enforcement action under EPCRA").

In United Musical Instruments, the plaintiff's notice letter identified specific violations occurring from 1987 to 1990, as well as "violations not yet known." Importantly, the

Sixth Circuit refused to allow the plaintiff to bring suit for a violation which allegedly occurred in 1991, holding that the notice of "violations not yet known" was inadequate (as a basis for the 1991 violation) because "the vague warning of possible other claims failed to inform [defendant] of the year of the additional alleged violation or even the specific EPCRA reporting requirement involved." Id. (emphasis added).

Although, in United Musical Instruments, the Sixth Circuit interpreted the citizen provision in the EPCRA rather than the identical provision of the CWA, this Court sees no basis for distinguishing between them, just as the Sixth Circuit did not distinguish between the RCRA and the EPCRA. Accordingly, on the basis of the Sixth Circuit's decision in United Musical Instruments, this Court holds that plaintiffs bringing suit under 33 U.S.C. § 1365 must provide notice of the specific limitations, standards, or orders alleged to be violated. In so holding, this Court acknowledges that the Third Circuit has refused to read Hallstrom as requiring this stringent standard of notice under § 1365, and has instead adopted a standard similar to the notice-in-fact standard discussed earlier. See Public Interest Research Group v. Hercules, Inc., 50 F.3d 1239 (3rd Cir.1995), rev'g in part 830 F.Supp. 1525, 1531–34 (D.N.J.1993).[14] However, this Court is bound by the decisions of the Sixth Circuit, and must follow the Sixth Circuit's reasoning in United Musical Instruments.

Furthermore, there are compelling policy reasons for holding that plaintiffs bringing suit under the Clean Water Act must identify the specific standard(s), limitation(s), or order(s) which are alleged to have been violated, and which will form the basis of any suit. The Supreme Court identified some of these reasons in Hallstrom:

14. In Public Interest Research Group v. Hercules, Inc., 50 F.3d 1239 (3rd Cir.1995), the Third Circuit held that the plaintiff need only provide sufficient information to allow the recipients to identify the alleged violation, and need neither specify individual violations, nor violations of monitoring, recordkeeping or recording requirements that are "directly related to" the violations identified in the notice. The Third Circuit distinguished Hallstrom by arguing that it focused on the timing rather than the contents of the notice, and by arguing that Hallstrom interpreted the statute (which does not prescribe the required contents, although it does instruct the Administrator to develop such requirements), rather than the regulation, which does set forth the required contents of notice letters.

[T]he legislative history [of the RCRA] indicates an intent to strike a balance between encouraging citizen enforcement of environmental regulations and avoiding burdening the federal courts with excessive numbers of citizen suits. Requiring citizens to comply with the notice and delay requirements serves this congressional goal in two ways. *First*, notice allows Government agencies to take responsibility for enforcing environmental regulations, thus obviating the need for citizen suits. *Second*, notice gives the alleged violator an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit.

493 U.S. at 29, 110 S.Ct. at 310 (emphasis added) (citations omitted). In *United Musical Instruments,* the Sixth Circuit agreed that "[o]ne of the important purposes of the notice requirement under environmental statutes is to facilitate 'dispute resolution by EPA negotiation [and thereby] reduce the volume of costly litigation." 61 F.3d at 478. In that case, the Sixth Circuit concluded that "[plaintiff's] failure to include the 1991 violation in its notice may have contributed to the EPA's decision not to act," and stated that this was one reason for finding that notice had been inadequate. *Id.*

Based upon these observations, this Court finds that the policy reasons for requiring Plaintiffs to identify the specific standard(s), limitation(s), or order(s) alleged to have been violated, is two-fold: *first,* such specific notice will allow government agencies to evaluate fully and adequately the violations alleged, and thereby to determine accurately their appropriate level of involvement in the matter; *second,* such specific notice will allow the recipient an opportunity to cure the violations before suit is brought, which may obviate the need for a costly lawsuit.

■ This Court now turns to the contents of the Plaintiffs' Notice Letter, discussed *supra,* at 831–32. It is clear that Plaintiffs failed to identify, in their Notice Letter, the specific standard(s), limitations(s), or order(s) alleged to have been violated in their suit

against Defendant Honda. Indeed, not only did Plaintiffs fail to identify the *specific requirements* in Defendant Honda's Indirect Discharge permit which are alleged to have been violated in Counts Ten and Eleven of Plaintiffs' Complaint, (as well as the specific law alleged to have been violated in Count Twelve), but they also *completely failed* to identify the Indirect Discharge permit anywhere in their Notice Letter.[15] Therefore, although Defendant Honda might have been able to infer that Plaintiffs intended to sue for, *inter alia,* violations which caused Clay Creek to be polluted, neither Defendant Honda, the EPA, nor the State was put on notice as to *which* permit parameters and requirements, and laws, would form the basis of Plaintiffs' lawsuit. That is, even if Defendant Honda could have inferred that Plaintiffs intended to bring suit under the Indirect Discharge Permit, it still could not have identified the specific violations alleged, because Plaintiffs might have brought suit under *any* of the numerous provisions and parameters in the Indirect Discharge Permit.

Due to these defects in the Notice Letter, and its lack of specificity as to which standard(s), limitation(s), or order(s) were alleged to have been violated by Defendant Honda, neither of the two policy goals identified above were satisfied in this case. *First,* because neither the State nor the EPA could fully evaluate the Plaintiffs' grievances, they were hampered in their ability to decide upon and implement an appropriate response. *Second,* because Defendant Honda was not notified of the specific violations for which it would be sued, it was denied the opportunity to remedy those violations before suit was filed. If either or both of these goals had been met, there may have been no need for Plaintiffs to bring this suit.

Under the facts of this case, the standards enunciated in *Hallstrom* and *United Musical Instruments,* and the policy goals behind the notice and delay requirements, this Court holds that Plaintiffs' failure to identify the specific permit provisions and federal regulations which are alleged in their Complaint to

---

15. Although these failures were called to Plaintiffs' attention by Defendant Honda shortly after they issued their Notice Letter (10/27/94 Letter), Plaintiffs never attempted to modify their initial Notice Letter, or to issue a second such letter.

have been violated by Defendant Honda, render its notice to Defendant Honda insufficient under 40 C.F.R. § 135.3(a). Because Counts Ten and Eleven of Plaintiffs' Complaint refer to specific provisions of Defendant Honda's Indirect Discharge Permit which were not referenced in the Notice Letter, and Count Twelve refers to specific federal regulations which were not identified in said Notice Letter, notice was insufficient, as Plaintiffs did not identify the specific standard(s), limitations(s), or order(s) alleged to have been violated. Therefore, this Court SUSTAINS Defendant Honda's Motion for Summary Judgment (Doc. # 11) in regard to Counts Ten, Eleven and Twelve.[16] Plaintiffs' three state law claims against Defendant Honda (Counts Thirteen, Fourteen and Fifteen) remain viable, since, as will be discussed *infra*, the Plaintiffs' federal claims against Defendant Village remain viable.

### III. Defendant Village's Motion for Partial Summary Judgment (Doc. # 12)

Defendant Village has moved for summary judgment on all federal CWA claims, namely: Counts One (violations of final effluent limitations in NPDES permit), Two (violations of general effluent limitations in NPDES permit, in reference to water quality standards), Three (sludge disposal NPDES permit violations), Four (sulfates CWA violations), Five (sewer sludge CWA violations), Six (water quality CWA violations) and Sixteen (post-complaint sewage NPDES permit violations).

As discussed earlier, the Clean Water Act authorizes citizen suits against persons who violate permits issued thereunder. § 1365(a)(1). Specifically relevant to the present motion is the following provision:

No action may be commenced—

. . . .

(b)(1)(B) if the Administrator or State has commenced and is *diligently prosecuting* a civil or criminal action in a court of the United States, or a State *to require*

*compliance* with the standard, limitation, or order, but in any such action in a court of the United States any citizen may intervene as a matter of right.

. . . .

33 U.S.C. § 1365(b)(1)(B) (emphasis added). Defendant Village argues that this provision bars Plaintiffs' suit, because the State filed a civil enforcement action against it in the Shelby County Court of Common Pleas on December 23, 1994 (Doc. # 12).

Plaintiffs argue that this provision does not bar its suit, for two reasons: *first*, the State did not "diligently prosecute" the action because the Plaintiffs were given no opportunity to intervene prior to the entering of the consent order, and the fine imposed was too low; *second*, the suit was not brought "to require compliance," because it expressly allowed non-compliance with Defendant Village's NPDES permit until June 30, 1998 (Doc. # 15). Further, in regard to specific NPDES permit requirements pertaining to sludge disposal violations (Count Three) and the specific CWA requirement pertaining to water quality violations (Count Six), Plaintiffs argue that the Consent Order did not seek compliance with these requirements.

In its Reply, Defendant Village argues for the first time that the Consent Order relieves it of all civil liability for all past violations, and further argues that the fine was properly and fairly negotiated by the parties. (Doc. # 18).

In order to rule upon this Motion, this Court must decide two main issues. *First*, it must determine, as a matter of law, whether § 1365(b)(1)(B) bars this action. This will require an examination of whether the state court action was brought "to require compliance," and whether it was "diligently prosecuted." *Second*, this Court must determine whether Defendant Village has met its burden of showing that no genuine issue of material fact exists as to whether it is com-

---

16. Because this Court has decided this motion on the ground of insufficiency of notice, it does not reach Defendant Honda's remaining arguments, in regard to its Motion for Partial Summary Judgment: (1) Plaintiffs' claims are barred by the State's civil enforcement action; and (2) Defendant Honda is not committing ongoing viola-

tions. Although these arguments are addressed, *infra*, in the context of Defendant Village's Motion for Partial Summary Judgment, the issues involved are different, given the non-similar status of Defendant Honda and Defendant Village in relation to both the Consent Order and the violations alleged by the Plaintiffs.

mitting ongoing violations, as the existence of ongoing violations is a mandatory prerequisite to this Court's jurisdiction over citizen suits under the CWA. *See Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (holding that § 1365(a) does not confer federal jurisdiction over citizen suits for wholly past violations).[17]

### A. Effect of § 1365(b)(1)(B) on Plaintiffs' Action

Under 33 U.S.C. § 1365(b)(1)(B), citizens seeking to bring an action under the Clean Water Act are barred from doing so if, *inter alia*, the State is diligently prosecuting a civil action in a state court to require compliance with a standard, limitation or order developed or issued under the authority of the Clean Water Act. It is undisputed that on December 23, 1994, the State of Ohio did prosecute a civil enforcement action against Defendant Village in the Shelby County Court of Common Pleas, for violations of the final effluent limitations in its NPDES permit. As discussed, this action resulted in a Consent Order, signed and entered the same day, which excused Defendant Village from complying with certain final effluent limitations for nearly four years, requiring instead that Defendant Village comply with two successive sets of interim limitations. Based on these uncontroverted facts, this Court must now determine, as a matter of law, whether the State's civil enforcement action was "to require compliance with the standard, limitation, or order," and whether it was "diligently prosecuted."

### 1. Was the civil action brought "to require compliance"?

■ This Court will first determine whether the State's civil enforcement action was brought "to require compliance with the standard, limitation, or order." Obviously, the crucial issue in this inquiry, is *which*

standard[s], limitation[s], or order[s] were at issue in the State's civil enforcement action. A careful reading of the citizen suit provision indicates that this is the proper inquiry:

No action may be commenced—

(1)(A) prior to sixty days after the plaintiff has *given notice* of the alleged violation ... to any alleged violator *of the standard, limitation, or order*, or

(1)(B) if the ... State has commenced ... a civil action ... *to require compliance with the standard, limitation, or order....*

33 U.S.C. § 1365(b). Read together, these provisions clearly indicate that a citizen suit to enforce a particular standard, limitation, or order will be barred only if the State commences a civil action to require compliance with *the same standard, limitation, or order* referenced in the plaintiff's 60–day notice letter, which provides the basis of the plaintiff's suit. Otherwise stated, citizen suits are barred only if they are based on the *very same* standards, limitations, or orders for which the State has brought a civil enforcement action, and only if the State seeks to require compliance with the same.

This reading of § 1365(b)(1)(B) is supported by common sense, in that it is more logical to interpret this provision as barring suits for violations *which were already addressed or are being addressed* in a civil or criminal action, than to interpret it as barring *any* future suits against the defendant, including suits for violations of different standards, limitations, or orders. It is further buttressed by the Supreme Court's observation that § 1365 has the "central purpose of permitting citizens to abate pollution when the government cannot or will not command compliance." *Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49, 62, 108 S.Ct. 376, 383–84, 98 L.Ed.2d 306 (1987). This clearly sug-

---

17. This Court does not decide, at the present time, whether the civil liability provision in the Consent Order effectively bars the imposition of civil penalties under § 1319(d) for violations which occurred prior to the date of the Consent Order. Given the complexity and importance of this issue, and the fact that it was not raised until the Defendant's Reply Memorandum (Doc. # 18), this Court deems said issue not to have been part

of Defendant Village's Motion for Partial Summary Judgment and, accordingly, prefers to delay ruling on this issue until it has the benefit of a full briefing on same by both parties. Should Defendant Village wish to raise this issue in a Supplemental Motion for Summary Judgment, leave of Court for such a filing is hereby granted, provided that same be filed within twenty (20) days of the date of this decision.

gests that citizens may sue whenever the government fails to require or seek compliance with the *specific* standard, limitation, or order, developed or issued under the authority of the CWA, and which is alleged by the plaintiff to have been violated.

Therefore, this Court must examine each individual count or claim of Plaintiffs' Complaint which is subject to this Motion for Summary Judgment, in order to determine whether the State's civil enforcement action sought compliance with the particular standard, limitation or order which provides the basis of that claim. Given that the parties entered into a pre-negotiated Consent Order on the same day that the suit was commenced, this Court will rely on both the Order, and the State's Complaint, to determine whether the State sought to require compliance with the particular standard, limitation or order at issue in this litigation. ·

■ Count One of Plaintiffs' Complaint sets forth a claim for violations of the following NPDES permit parameters: suspended solids, oil and grease, ammonia, fecal coliform, carbonaceous biochemical oxygen demand, and dissolved oxygen. As noted in this Court's discussion of the facts, alleged violations of these six parameters provided the exact basis of the State's Complaint. *However,* as can be seen from the quantitative comparison of the final limitations with the interim limitations, *supra,* at 829–30, the Consent Order only required Defendant Village to comply with the final effluent limitations in the NPDES permit for *two* of these · parameters: oil and grease, and fecal coliform. For the remaining four parameters— suspended solids, ammonia, CBOD5, and dissolved oxygen—the Consent Order deliberately failed to require compliance with the final effluent limitations in the NPDES permit, by allowing Defendant Village to comply with two successive sets of interim limitations until June 30, 1998, when the NPDES permit limitations would again be enforced. Therefore, although it could be argued that the State sought *in its Complaint* to require compliance with these four parameters, the State's act of simultaneously filing a Consent Order which expressly declined to require such compliance, and its failure to submit a copy of the NPDES permit until a week after this action was filed and resolved (Notice of Errata), indicates that the allegations in the Complaint were a mere formality, and that ·the State did *not,* as a practical (as opposed to a technical) matter, bring this civil action for the purpose of requiring compliance with these four permit parameters.

One reasonable argument which could be made in support of the theory that the State *did* seek to require compliance with these four parameters, albeit on a long-term basis, is one of practical exigency: namely, that Defendant Village would be unable to comply with these specific parameters of its NPDES permit until it had constructed new facilities, and in order to provide an incentive for such construction to be undertaken—and to make the construction financially possible by relieving Defendant Village of any additional financial liability for violations—the Consent Order excused Defendant Village from its obligation to comply with these four specific parameters until June, 1998, thereby achieving compliance in the long term.

This argument was not made by the Defendant. Even if it had been made, however, this Court, though sympathetic to arguments of practical exigency, would nevertheless be compelled to reject it. The Consent Order clearly stated that "the interim effluent limits ... do *not* constitute an NPDES permit or a modification of any existing permit." (Consent Order, p. 2) (emphasis added). Moreover, Defendant Village's NPDES permit has not been properly modified, by the required procedures for modification set forth in O.A.C. 3745–33–06. Therefore, this Court must view the final effluent limitations in Defendant Village's NPDES permit as not being revoked or modified by any provision or interim order contained in the Consent Order, and, therefore, as having full force and effect and as being enforceable.

The State has agreed not to enforce these permit limitations until June, 1998, and the United States EPA reviewed this matter and declined to take· any action. The government's failure to enforce specific final effluent limitations in the Defendant's NPDES permit does *not* prevent Plaintiffs from seek-

ing to enforce them through a citizen suit, such as the instant action. Earlier in this opinion, this Court quoted the Supreme Court's observation that § 1365 has the "central purpose of permitting citizens to abate pollution when the government cannot or will not command compliance." *Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49,.62, 108 S.Ct. 376, 383–84, 98 L.Ed.2d 306 (1987). At least in regard to the four parameters which the State has agreed not to enforce until June, 1998, this would appear to be just such a case.[18]

..[6] The six remaining Counts may be considered together. Counts Two and Three are based on violations of specific permit requirements regarding general effluent limitations (Count Two) and sludge disposal (Count Three). Count Four, for sulfates discharges, is based on the permit's *lack* of any parameters authorizing the discharge of sulfates, in violation of 33 U.S.C. § 1311, which makes illegal the discharge of any pollutants except in compliance with the law, including NPDES permits. Counts Five and Six relate neither to permit parameters, nor the lack thereof, but rather to violations of specific regulations. Plaintiffs allege that Defendant Village has discharged sewer sludge in violation of federal regulations promulgated to implement 33 U.S.C. § 1345 (Count Five), and has further violated water quality standards set by the state, in violation of 33 U.S.C. § 1312 (Count Six).[19] Finally, Count Sixteen alleges that Defendant Village discharged sewage from an impermissible outfall location, not authorized by its NPDES permit.

A cursory examination of the State of Ohio's Complaint filed in the Shelby County Court of Common Pleas, reveals that the State referred to *none* of these alleged violations, in that action. Instead, the only violations which were mentioned in the State's Complaint, are those that were included in Count One of Plaintiffs' Complaint. This indicates that the State did *not* seek to enforce compliance with any of the permit requirements, or laws, which provide the basis for these six claims (Counts Two, Three, Four, Five, Six and Sixteen).

■ In its Reply, Defendant Village insists that the following provision of the Consent Order was intended to relieve it of civil liability for any and all violations, including those not specifically alleged in the State's Complaint:

> Compliance with the terms of this Consent Order shall constitute full satisfaction of any civil liability by Defendant for all claims *under such laws alleged in the Complaint* and for *any violations of the effluent limitations of Anna's NPDES permit* (s) which have occurred prior to the filing of the [C]omplaint.

Consent Order, p. 2 (emphasis added). This Court generally declines to consider arguments which are raised for the first time in a Reply Memorandum. However, this Court will offer the following observations. First, this provision, if applicable, would appear to go only to Defendant Village's civil liability, see *supra* note 17, rather than to any injunctive relief which might be sought. Second, the plain language of this provision suggests that it does *not* apply to violations of laws not mentioned in the State's Complaint, or to permit requirements other than the specific effluent limitations mentioned in that Complaint. In other words, it would appear not to apply to any of the six remaining Counts.[20]

18. Because Plaintiffs in this action seek to require immediate compliance with these four parameters, whereas the State did not require such timely compliance, this Court notes that Defendant Village's reliance on *Connecticut Fund for the Environ. v. Contract Plating Co., Inc.*, 631 F.Supp. 1291, 1293 (D.Conn.1986) to argue that Plaintiffs' claims are barred because Congress intended "to bar citizens' suits whenever the *same purpose* could adequately be achieved by a prior pending state suit," is unavailing. Because the State did *not* achieve the same purpose which is here sought by the Plaintiffs—namely, immediate compliance with all NPDES permit limitations—the district court's reasoning in *Contract Plating Co.* is inapposite here.

19. As noted earlier, this Court is uncertain whether Plaintiffs intended to bring this claim under § 1312, or § 1313.

20. The following permit-related parameters were not mentioned in the Complaint: the general effluent limitations (Count Two), the sludge disposal requirements (Count Three), or the *lack* of any sulfates effluent parameter (Count Four). Moreover, neither the following laws, nor their

In summary, this Court concludes, as a matter of law, that the State's civil enforcement action sought "to require compliance" with only two of the six parameter violations listed in Count One of Plaintiffs' Complaint, and did not seek to require compliance, in either the State's Complaint or the Consent Order, with the laws or permit requirements which provide the bases of Counts Two, Three, Four, Five, Six and Sixteen of the Plaintiffs' Complaint.

### 2. Did the State diligently prosecute the civil action?

Next, this Court will consider, as a matter of law, whether the State of Ohio "diligently prosecuted" the civil action filed in the Shelby County Court of Common Pleas on December 23, 1994, within the meaning of § 1365(b)(1)(B).

As an initial matter, this Court will briefly review its authority for examining whether the State's prosecution was sufficiently diligent. The legislative history of the citizen suit provision indicates that Congress intended the courts to engage in such an inquiry:

It should be emphasized that if the agency had not initiated abatement proceedings following notice or if the citizen believed efforts initiated by the agency to be inadequate, the citizen might choose to file the action. In such case, the courts would be expected to consider the petition against the background of the agency action and could determine that such action would be adequate to justify suspension, dismissal, or consolidation of the citizen provision. On the other hand, if the court viewed the agency action as inadequate, it would have jurisdiction to consider the citizen action notwithstanding any pending agency action.

Federal Water Pollution Control Act Amendments of 1972, S.Rep. No. 414, 92d Cong., 1st Sess., *reprinted in* 1972 U.S.Code Cong. & Ad.News 3668, 3746. Other courts have undertaken this very same inquiry, when con-

sidering a claim that the plaintiff's suit is barred by § 1365(b)(1)(B). *See, e.g., Dague v. City of Burlington,* 935 F.2d 1343, 1353 (2d Cir.1991), *rev'd in part on other grounds,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) ("the state's conduct in this case does not meet the level of diligence that would trigger the prohibition against a citizen suit"); *Friends of the Earth v. Laidlaw Environ. Servs.,* 890 F.Supp. 470, 486 (D.S.C. 1995) ("the critical issue presently before the court is whether [the state's lawsuit] constitutes diligent prosecution sufficient under [§ 1365(b)(1)(B) ] to bar the plaintiffs' citizen suit"). Therefore, this Court will proceed to consider the issue.

Plaintiffs raise three arguments in relation to this issue: *first,* that the state enforcement action was not a court proceeding; *second,* that the action was not diligently prosecuted because they were refused the opportunity to intervene, and *third,* that the fine which was imposed was too low. This Court will consider each of these arguments in turn.

█ The first argument may be disposed of rather easily. In support of their argument, Plaintiffs cite a case in which the court found that an Assurance between the State and the defendant which was "simply filed and entered as an order of the state court," without the filing of a civil or criminal action, was not diligently prosecuted. *Dague,* 935 F.2d at 1343. This case is factually inapposite, given that, in this case, the State *did* file a civil enforcement action in state court.

In further support of their argument, Plaintiffs cite a number of cases which held that *administrative* proceedings did not qualify as "court proceedings," due to various limitations or procedural defects. *See Student Public Interest Research Group v. Fritzsche, Dodge & Olcott, Inc.,* 759 F.2d 1131, 1135–39 (3rd Cir.1985) (administrative proceeding not a "court" proceeding because EPA lacked authority to impose civil penalties, denied the rights of citizens to inter-

---

analogous state counterparts, if any, were mentioned in the Complaint: 33 U.S.C. § 1345 (disposal of sewage sludge) (Count Five); 33 U.S.C. § 1312 (water quality related effluent limitations) *or* 33 U.S.C. § 1313 (water quality standards and

implementation plans) (Count Six). Finally, the State's Complaint made no reference to any discharge of sewage at an unauthorized outfall location (Count Sixteen).

vene, and did not provide the procedural safeguards found in federal court proceedings); *Baughman v. Bradford Coal Co., Inc.,* 592 F.2d 215 (3rd Cir.1979), *cert. denied,* 441 U.S. 961, 99 S.Ct. 2406, 60 L.Ed.2d 1066 (1979) (administrative proceeding not a "court" proceeding because State lacked power to assess statutory penalties or enjoin violations, and did not provide citizens with a right to intervene); *Wiconisco Creek Watershed v. Kocher Coal Co.,* 641 F.Supp. 712, 714 (M.D.Pa.1986) (state administrative proceeding not a "court" proceeding because it lacked procedural safeguards, and did not give citizens the opportunity to intervene in the proceedings). Although this Court appreciates that there are similarities between the facts of these cases, and the present case—namely, Plaintiffs were denied intervention, and the same-day resolution of the action lacked the usual procedural safeguards of an adversary presentation, witnesses, and a hearing—it nevertheless cannot escape the fact that the State *did* commence "a civil ... action in a court of the ... State...." § 1365(b)(1)(B). On that basis, these cases appear to be factually inapposite. However, this Court agrees with Plaintiffs that the State's civil enforcement action appears to have sidestepped the traditional trappings of court proceedings:

> The EPA enforcement process does not incorporate an independent decisionmaker or administrative law judge to weigh the evidence, nor does it allow for opposing parties to present such evidence. In addition, no witnesses are called, no hearing is held, and no formal transcripts or records of decisions are maintained. In short, the EPA's enforcement action bears no procedural similarity at all to a traditional court action. Rather, it consists entirely of private negotiations between the EPA and the discharger—negotiations which are not designed to subsume the procedural protections of the adversarial system.

*Fritzsche,* 759 F.2d at 1139. Although these safeguards were notably and regrettably absent in the State's civil action, given that the

action was filed in a court, this Court cannot in good conscience hold that it was not a "court proceeding."

■ Next, this Court will consider the argument that the State did not diligently prosecute its civil action, because it denied the Plaintiffs an opportunity to intervene. As the facts of this case indicate, Plaintiffs' counsel repeatedly, on at least three separate occasions, requested the opportunity to intervene in the negotiation process, and further requested that his clients be allowed to intervene in the civil action, to no avail. This Court must now determine the relevance of these facts to this issue.

■ Because the issue of whether an action was diligently prosecuted is a matter of federal law, *see Friends of the Earth v. Laidlaw Environ. Serv.,* 890 F.Supp. 470, 486 n. 8 (D.S.C.1995), this Court need not restrict its analysis to provisions of state law.[21] Among the federal regulations which implement the NPDES permit program, is the following relevant provision:

> (d) Any State administering a [NPDES permit] program shall provide for public participation in the State enforcement process by providing either:
>
> (1) Authority which allows intervention as of right in any civil or administrative action to obtain [temporary restraining orders, injunctions of permit violations, civil penalties, and criminal fines] by any citizen having an interest which is or may be adversely affected; or
>
> (2) Assurance that the State agency or enforcement authority will:
>
> (i) Investigate and provide written responses to all citizen complaints submitted pursuant to the procedures specified in § 123.26(b)(4);
>
> (ii) Not oppose intervention by any citizen when permissive intervention may be authorized by statute, rule, or regulation; and
>
> (iii) Publish notice of and provide at least 30 days for public comment on any

---

**21.** As previously stated, states may obtain federal approval to establish state NPDES permit programs, and to issue NPDES permits thereunder. 33 U.S.C. § 1342(b). Holders of state-issued

NPDES permits are subject to both state and federal enforcement actions relating to alleged violations of these permits. 33 U.S.C. § 1319(a); § 1342(b)(7) and (i).

proposed settlement of a State enforcement action.

40 C.F.R. § 123.27(d). For an overview of the legislative history supporting public participation, as applied to this regulation, see *Natural Resources Defense Council v. United States EPA*, 859 F.2d 156, 177 (D.C.Cir. 1988).

Although the State of Ohio is required to comply with all requirements for state NPDES permit programs, including this one, this Court has been unable to uncover the specific state regulations which implement this provision. Although this Court would ordinarily hesitate to conclude that its inability to find the law meant that such law did not exist, such a conclusion is strengthened by the Northern District of Ohio's conclusion that "[a]lthough Ohio law sets out circumstances under which an agency may decide to provide for notice, comment and hearings, it also allows the OEPA the discretion to avoid such public participation." *Natural Resources Defense Council v. Vygen Corp.*, 803 F.Supp. 97, 101 (N.D.Ohio 1992). The validity of the State's program, in view of its failure to provide these required public participation safeguards, is not at issue here. However, the fact that Plaintiffs could not rely on any state law provision to give them an opportunity to intervene *is* relevant, because it serves to refute Defendant's argument that Plaintiffs had any such right to intervene.[22] Although the facts indicate that the Plaintiffs did everything that could reasonably have been done to seek intervention prior to the entry of the Consent Order, they were not allowed to do so.

Other courts have found that denial of a citizen's right to intervene indicates that the action was not diligently prosecuted. *See, e.g., Friends of the Earth v. Laidlaw Environ. Servs.*, 890 F.Supp. 470, 489–90 (D.S.C. 1995) (finding that plaintiffs had no opportunity to intervene because the action was settled the day after it was filed); *Love v. New York State Dept. of Environ. Conserv.*, 529 F.Supp. 832, 844 (S.D.N.Y.1981) (civil action not diligently prosecuted, in part because plaintiffs were denied opportunity to intervene). This Court similarly concludes, after reviewing the applicable law and the relevant facts, that the State denied Plaintiffs an opportunity to intervene in the civil enforcement proceeding, and that this denial provides a basis for holding that the civil action was not diligently prosecuted, within the meaning of § 1365(b)(1)(B).[23]

22. Defendant Village attempts to argue that, "for whatever reason ... plaintiffs failed to move for intervention in the Enforcement Action or as a post-judgment matter." (Doc. # 18, p. 2). This argument is totally disingenuous, given that both Defendant Village and the State were notified before the action was filed that Plaintiffs wished to intervene in the judicial action, and that both had received multiple inquiries from Plaintiffs regarding their desire to participate in the negotiations, and comment on the proposed Consent Order. Moreover, the civil action was summarily resolved in one day, without any hearing, and apparently without providing any opportunity for intervention. Another court, faced with a similar scenario, responded as follows:

> The right of citizens to intervene in FWPCA cases was granted by Congress on a broad scope. This apparently was in recognition of the fact that the agencies involved might not always prosecute to the fullest extent possible or protect all interests. It would seem to be a frustration of the clear intent of Congress to allow a complaint and consent order to be simultaneously filed with the consent order to become effective at an early date and then object to intervention on the basis of timeliness ... [defendant] should have structured the proposed consent order so as to allow time for this procedure.

*United States v. Ketchikan Pulp Co.*, 74 F.R.D. 104, 107 (D.Alaska 1977). This Court agrees wholeheartedly with this analysis. Accordingly, this Court emphatically rejects the argument that "Plaintiffs always had the right to intervene but never sought intervention, before or after judgment." (Doc. # 18, 11).

23. Defendant Village relies upon a Southern District of Ohio case, *City of Heath v. Ashland Oil, Inc.*, 834 F.Supp. 971, 981–82 (S.D.Ohio 1993), to argue that a State may "diligently prosecute" an action where it files a consent order and complaint on the same day. This Court finds *Heath* to be factually inapposite to this case, because the plaintiffs in *Heath* did *not* argue that they had been denied an opportunity to intervene in the civil enforcement action, but merely argued that "the fact that the complaint and the consent order were filed on the same day demonstrates" a lack of diligent prosecution. *Id.* at 981. Therefore, the Court's holding in *Heath* appears to be limited to the issue of whether the simultaneous filing of a consent order with a complaint indicates a lack of diligent prosecution, and is not persuasive here.

Importantly, the State's apparent failure to enact the public participation safeguards which are mandated by the implementing regulations of the Clean Water Act, *see* 40 C.F.R. 123.23(d), does not alter the federal standard of "diligent prosecution," which requires these safeguards to be provided and followed. In other words, although the State apparently need not, under its present law, provide for public participation in its enforcement process, its failure to allow for such public participation may impede its ability to bar citizen suits for the same violations.[24]

Finally, Plaintiffs argue that the action was not diligently prosecuted, because the State imposed a civil fine of only $50,000 on Defendant Village, despite the numerous violations described in the State's Complaint, which occurred over a four-year period. *See, e.g., Friends of the Earth v. Laidlaw Environ. Servs.*, 890 F.Supp. 470, 491 (D.S.C. 1995) ("A lenient penalty that is far less than the maximum penalty may provide evidence of non-diligent prosecution"). In their Reply Memorandum, Defendant Village submitted a supplemental affidavit which explained that although the State initially requested that Defendant Village pay a fine of $250,000, the parties eventually agreed on a fine of $50,-000, because of the Village's small size and limited resources (Hulsmeyer Supplemental Affidavit). Because this explanation was not made until Defendant's Reply Memorandum (Doc. # 18), Plaintiffs have not had the opportunity to respond to it. Therefore, this Court declines to reach the issue of whether the low amount of the fine imposed by the

Consent Order, is evidence of non-diligent prosecution. In any event, given this Court's determination that the State's failure to allow Plaintiffs to intervene or comment upon the Consent Order is evidence of non-diligent prosecution, it need not reach this argument at this time.

In sum, this Court has examined the issue of whether 33 U.S.C. § 1365(b)(1)(B) bars Plaintiffs' action against Defendant Village. This Court has concluded, as a matter of law, that Plaintiffs' action is not barred by this provision, on two grounds: *first*, the State did not seek to require compliance with the laws or permit requirements that form the basis of Count One in part (except for violations of oil and grease, and fecal coliform parameters) and Counts Two, Three, Four, Five, Six and Sixteen; *second*, the State denied Plaintiffs the opportunity either to intervene or to comment on the Consent Order, and thereby did not diligently prosecute the action which was filed. Although this Court has concluded that the State *did* seek to require compliance with two of the six NPDES permit parameters (oil and grease, and fecal coliform) on which Plaintiffs base Count One of their Complaint, this Court will allow these claims to remain in this lawsuit *at this time*, pending a determination of Defendant Village's potential civil liability for pre-Consent Order violations of said parameters.[25] *See supra* note 17.

## B. Existence of Ongoing Violations

Next, this Court must determine whether Defendant Village has shown that

---

24. Assuming that the State of Ohio *has* complied with this mandate, this Court nevertheless concludes that, regardless of which option was chosen by the State, it was not satisfied here. That is, if the State provides citizens with a right to intervene in State civil enforcement actions, the Plaintiffs' rights to intervene in this action were clearly denied. *See supra* note 22. If, on the other hand, the State chose to comply with the second option, then, at the very least, it failed to "provide at least 30 days for public comment on any proposed settlement of a State enforcement action." In sum, assuming that the State has indeed enacted the required public participation safeguards, Plaintiffs were either denied their right to intervene, or were denied their right to review and comment upon the proposed Consent Order.

25. As noted, this Court has found that the State did not "diligently prosecute" its civil enforce-

ment action as required by § 1365(b)(1)(B), because it denied Plaintiffs the opportunity either to intervene in the proceedings, or to comment upon the proposed consent order. Based upon this conclusion, Plaintiffs could argue that they were prejudiced by their inability to oppose or comment upon the $50,000 fine imposed on Defendant Village for all pre-Consent Order violations, including violations of the oil and grease and fecal coliform parameters in Defendant's NPDES permit, and that they should therefore be able to seek additional fines for these violations. Accordingly, this Court prefers to allow Plaintiffs' claims relating to the oil and grease and fecal coliform parameters to remain in this lawsuit, pending further briefing and a decision on the issue of Defendant Village's potential civil liability for pre-Consent Order violations.

no genuine issue of material fact exists as to whether it is committing ongoing violations, as opposed to wholly past violations. The requirement that Plaintiffs demonstrate the existence of ongoing violations is a mandatory prerequisite to this Court's jurisdiction over citizen suits under the CWA. *See Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (holding that § 1365(a) does not confer federal jurisdiction over citizen suits for wholly past violations).

■ Defendant Village apparently concedes that it is not complying with its NPDES permit limitations, by stating that it "is close to complying with its NPDES permit limits" (Hulsmeyer Supplemental Affidavit). However, it argues that it *is* complying with the interim limitations in the Consent Order, and, therefore, that there are no ongoing violations (Doc. #12). In order to determine the validity of this argument, this Court must consider whether the OEPA has the authority, by either an administrative order or a court-approved Consent Order, to excuse compliance with existing NPDES permit requirements by replacing them with interim limitations.

Two cases are directly on point. In each of these cases, the defendants entered into administrative consent orders which provided for interim limits, and then argued that these limits validly extended the deadline for their compliance with the limitations contained in their NPDES permits. *Citizens for a Better Environ. v. Union Oil Co.*, 861 F.Supp. 889, 899 (N.D.Cal.1994); *Public Interest Research Group v. Rice*, 774 F.Supp. 317, 324 (D.N.J. 1991). Both courts noted that under the CWA, dischargers who violate NPDES permit limitations automatically violate the Act. *Union Oil Co.*, 861 F.Supp. at 898; *Rice*, 774 F.Supp. at 325. However, both defendants argued that the court should find that the agency's issuance of the interim limitations

somehow excused the defendants' non-compliance with the NPDES requirements.[26] Both courts rejected these arguments. *Union Oil Co.*, 861 F.Supp. at 903 ("an administrative enforcement action by a state agency charged with enforcing the CWA that purports to extend the deadline specified in an NPDES permit for complying with the permit's discharge limits does not serve to suspend the permit's deadlines such that they may not be enforced through a citizen suit"); *Rice*, 774 F.Supp. at 327 ("plaintiffs are entitled to sue the defendant for the violations of its permit, because the EPA has declined to enforce the permit limitations.... it is apparent that the EPA turned the other way while the defendant had an existing obligation to take corrective action.").

Defendant Village argues that this Court should excuse its non-compliance, relying on a case in which the court found that although the permit limitations still had legal effect, it would not allow plaintiffs to sue for violations of the same:

Under these regulations an interim order would not alter the permit limitations. However, the court believes the EPA should be allowed considerable discretion i[n] attempting to rectify pollution problems. The court is hesitant to hold that a permittee may be subject to suit for violating its permit limitations when the EPA has set another limitation by interim order. In this case, the plaintiff has not clearly established that the interim limit is insufficient to protect the area in question. Therefore, the court will not second guess the EPA....

*Arkansas Wildlife Fed. v. Bekaert Corp.*, 791 F.Supp. 769, 782 (W.D.Ark.1992). This Court respectfully disagrees with the Arkansas district court's decision to deny enforcement of the NPDES permit limitations out of deference to the EPA, unless the plaintiff clearly established that the interim limita-

26. In *Union Oil Co.*, the defendant argued that the administrative consent order had "the legal effect of suspending the effect of the permit requirements such that a polluter is shielded from citizen suits seeking to enforce compliance with the permit's original deadline and limits." 861 F.Supp. at 900. In *Rice*, the defendant argued that it would be unable to comply with the NPDES limitations until it had constructed a new plant, and urged the court not to interfere with the agreed-upon plan, as it "could delay or prevent the construction and operation of the [plant]." 774 F.Supp. at 325. This Court notes that this (rejected) argument could easily be made in this case.

tions are "insufficient to protect the area in question." Once again, this Court refers to the Supreme Court's pronouncement that § 1365 has the "central purpose of permitting citizens to abate pollution when the government cannot *or will not* command compliance." *Gwaltney v. Chesapeake Bay Found.*, 484 U.S. 49, 62, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987) (emphasis added). This Court is simply not authorized to defer to the State's discretion in certain, select cases by denying citizens their right to enforce NPDES permit limitations where the government has failed to do so. Therefore, it does not find *Arkansas Wildlife Fed.* to be persuasive, and, given that it is not binding precedent, this Court will not adopt its reasoning.

Based upon the reasoning in and conclusions of *Rice* and *Union Oil Co.*, and based on the "central purpose" of the citizen suit provision as explained in *Gwaltney,* this Court rejects Defendant Village's argument that it is not committing any violations because it is complying with the interim limitations in the Consent Order, although failing to comply with the limitations in its NPDES permit.[27] Instead, this Court holds, as a matter of law, that the Consent Order entered into by the parties did *not* suspend the legal effect of the NPDES limitations. Therefore, any violation of those permit limitations is actionable in this private lawsuit.

This Court now turns to the issue of whether there exists a genuine issue of material fact as to the commission of ongoing violations by the Village. Through its Services Director, Jon Hulsmeyer, Defendant Village has conceded that it is merely "close" to complying with the limitations contained in its NPDES permit, which would allow a jury to reasonably infer that it is *not* complying with those limitations (Hulsmeyer Supp. Affidavit). Moreover, Defendant Village does *not* show, or even argue, that it is complying

with the limitations in its NPDES permit. Construed in the manner most favorably to the Plaintiffs, Defendant Village has failed to meet its burden of production under Rule 56, by showing that there exists no genuine issue of material fact as to whether it is committing ongoing violations. Therefore, Plaintiffs *need not* present evidentiary material to show that there exists a genuine issue of material fact as to the issue of ongoing violations by Defendant Village, in order to prevail on this Motion for Partial Summary Judgment.

Accordingly, because this Court has held that Plaintiffs' suit is not barred by 33 U.S.C. § 1365(b)(1)(B), and because this Court has found that Defendant Village has failed to meet its burden of production under Rule 56 by showing that the evidence in the record, construed favorably to the non-moving party, does not raise a genuine issue of material fact as to the existence of ongoing violations of Defendant Village's NPDES permit, it OVERRULES Defendant Village's Motion for Partial Summary Judgment (Doc. # 12) as to Counts One, Two, Three, Four, Five, Six and Sixteen.

WHEREFORE, based upon the aforesaid, this Court SUSTAINS Defendant Honda's Motion for Partial Summary Judgment (Doc. # 11) as to Counts Ten, Eleven and Twelve. This Court OVERRULES Defendant Village's Motion for Partial Summary Judgment (Doc. # 12) as to Counts One, Two, Three, Four, Five, Six and Sixteen.

This Court DENIES Plaintiffs' Request for Oral Argument (Doc. # 15) on Defendant Village's Motion for Partial Summary Judgment (Doc. # 12), and further DENIES Defendant Village's Request for Oral Argument (Doc. # 18) on the same motion.

Plaintiffs are instructed to authenticate, in the manner required by Rule 56 of the Fed-

---

27. This Court recognizes that the consent order in this case was judicially approved, whereas the consent orders in *Rice* and *Union Oil Co.* were purely administrative. However, this distinction does not appear to be significant, because even assuming *arguendo* that courts, unlike agencies, have the authority to modify the terms of an NPDES permit or suspend their effect, this Court would be unable to conclude that such authority was properly exercised in this case. It is undis-

puted that the Shelby County Court of Common Pleas was clearly unaware of the nature or quantity of the NPDES permit limitations, as it did not receive a copy of the NPDES permit until one week *after* the Consent Order was entered (Notice of Errata). Thus, it could not have reviewed or evaluated the relevant NPDES permit limitations, which presumably is a necessary prerequisite to either modifying those limitations, or suspending their effect.

eral Rules of Civil Procedure, the following exhibits within twenty (20) days of the date of this decision: letter dated August 2, 1994, from Plaintiffs' counsel to the Ohio Attorney General's Office ("8/2/94 Letter") (Doc. # 15, Exh. D); letter dated September 20, 1994, from Plaintiffs' counsel to the Ohio Attorney General's Office ("9/20/94 Letter") (*Id.*, Exh. E); letter dated October 14, 1994, from Jack Van Kley, Ohio Attorney General's Office, to Plaintiffs' counsel ("10/14/94 Letter") (*Id.*, Exh. F); letter dated October 25, 1994, from Plaintiffs' counsel to Van Kley ("10/25/94 Letter") (*Id.*, Exh. H); letter dated December 22, 1994, from Plaintiffs' counsel to Defendant Village and Ohio Attorney General's office ("12/22/94 Letter") (*Id.*, Exh. J); Notice of Errata dated December 30, 1994, from Ohio Attorney General's office to Shelby County Court of Common Pleas ("Notice of Errata") (*Id.*, Exh. S); and Defendant Village's NPDES permit number 1PB00004*DD ("NPDES permit") (*Id.*, Exh. T.).

Finally, leave of this Court is granted to Defendant Village to file a supplemental motion for summary judgment, within twenty (20) days of the date of this decision, relating to the effect of the Consent Order's civil liability provision on Defendant Village's potential civil liability for violations occurring before the date of the Consent Order.